IN RE FERNANDO GALLARDO DÍAZ, JUDGE OF THE SUPERIOR COURT OF PUERTO RICO, Respondent.

No. 3     Submitted April 18, 1958.—Decided November 13, 1958.

*J. B. Fernández Badillo, Secretary of Justice,* and *José C. Aponte* and *Guillermo A. Gil, Special Prosecuting Attorneys at large,* for complainant.   *Benjamín Ortiz* and *Yamil Galib* for respondent.

## ORDER

San Juan, Puerto Rico, November 13, 1958

The hearing of this case was held on March 19–25, 1958, without the participation of Mr. Justice Pérez Pimentel and Mr. Justice Saldaña, who had disqualified themselves to take part therein.

Mr. Justice Belaval having today announced his determination not to participate in the final decision of this matter, the Court is equally divided as to whether or not the charges preferred in the complaint have been proved, since the views in the affirmative of Mr. Chief Justice Negrón Fernández and Mr. Justice Serrano Geyls can not be reconciled with the negative views of Mr. Justice Hernández Matos and Mr. Justice Santana Becerra.

This Court being unable to reach a majority agreement in the final disposition of the case, it is hereby ordered that the complaint filed against Superior Judge Fernando Gallardo Díaz be dismissed and that he be reinstated in his office of Judge, to take effect immediately; it being further ordered that payment be tendered in his favor covering the salaries corresponding to the period of suspension from employment and salary.

The opinions expressing the different views in the case will be delivered shortly.

It was so decreed by the Court as witness the signature of the Chief Justice. Mr. Justice Pérez Pimentel, Mr. Justice Belaval, and Mr. Justice Saldaña took no part.

---

Findings of fact made by the Court and set forth by Mr. JUSTICE HERNÁNDEZ MATOS.

San Juan, Puerto Rico, March 12, 1959

On May 7, 1957, Mr. César Andréu Ribas, attorney-at-law, filed a petition under oath with the Administrative Director

of the Office of Court Administration, preferring charges against Superior Judge Fernando Gallardo Díaz, as a result of the events which occurred in the morning of the third of the same month during the incident for the approval of a transcript of the stenographic notes in a certain criminal case that was being heard in the Bayamón Part of the Superior Court, presided by said judge.[1]

---

[1] Its text reads as follows:

"Last Friday I went to visit you to inform you personally of the abusive attack which Fernando Gallardo Díaz, Superior Judge of the Bayamón Part, made upon me, in open court, in the presence of numerous public composed of ladies and gentlemen, attorneys of both sexes, and other officers of the court and members of the Commonwealth police. The gravity of the events, which have no precedents, since it was a violent challenge on the part of the magistrate against a practicing attorney—which constitutes a flagrant violation of the penal statute which said magistrate is the first one who is bound to respect and enforce—as well as the knowledge which I have acquired by information of other analogous incidents on the part of Judge Fernando Gallardo Díaz towards other attorneys, district attorneys, witnesses, and litigants, place me in the sad and unpleasant alternative, which for many years I have eluded, of filing the following complaint with the Honorable Supreme Court of Puerto Rico, through your office, as provided by the text of § 24 of the Judiciary Act, with a view and request that the facts which I am denouncing be investigated and the Honorable Supreme Court impose on the respondent such punishment as in its opinion his behavior calls for.

"Towards the end of last year I was engaged by Miguel Angel Marín Canals, a chemist, to represent him in two criminal cases (G-56-198 and M-56-251), for violations of the Weapons Act.

"On arraignment, the attorney who represented the defendant, appointed by Judge Gallardo himself, was my colleague José R. Fournier, who pleaded not guilty and moved for trial by jury, informing the court that the undersigned would assist the defendant at the trial. Notwithstanding the antecedents of animosity between the magistrate and the undersigned attorney (antecedents which gave rise to the filing of motions for disqualification to act in other cases which I represented), Judge Gallardo presided the hearing of the trials against Marín Canals, which were heard jointly on January 24 and 25. Although we believed that both cases, the misdemeanor and the felony, would be heard before the jury (it was so requested pursuant to the provisions of § 178 of the Code of Criminal Procedure), to our surprise on the day of the trial only one was submitted to the jury, the felony, and the misdemeanor was decided by Judge Gallardo. At the close of District Attorney Grajales' evidence, waiving the only witness who was not a policeman, the magistrate ordered the jury to retire and addressing District Attorney Grajales, rebuked him, criticizing his indolence in the investigation of facts, calling him deficient for not having

The Chief Justice having been thus informed, this Supreme Court, by order of May 9, 1957, ordered "a complete and full investigation of all the facts, circumstances and incidents resulting from the filing and hearing of a 'Motion for Amendments to the Transcript of Evidence' in criminal case No. C-56-198 of the Superior Court of Puerto Rico, Bayamón Part," and at the same time requested the Secretary

gone to Cataño and 'tied up' all the possible eyewitnesses so that the defense would not have been able to produce them in court the day of trial to contradict the facts and account presented by the prosecution. Notwithstanding those remarks and the fact that in less than half an hour the jury reached a verdict of acquittal after hearing the testimony of five citizens, Judge Gallardo found him guilty of the crime of possessing a weapon without a license, imposing on him a six-month jail sentence, asking the district attorney after so doing, for a so-called 'penal record' (which was not introduced in evidence and, therefore, was not proof in the case, nor examined and much less contradicted by defendant), and ended by saying: 'I believe that the present conviction is warranted . . .'. Defendant immediately appealed from said judgment, requesting the transcript of evidence, which was furnished by reporter stenographer Juan Amaral, by order of the court.

"That after reading said transcript and discovering the omission of the remarks of the incident between Judge Gallardo and District Attorney Grajales, which were substantially important for our appeal, since they established the state of mental doubt of the magistrate after hearing the evidence of the prosecution, we filed on March 21, 1957, a motion for amendments to said transcript, accompanied by a petition for continuance of the hearing for the approval of the transcript which had already been set for April 5, because we would be absent from Puerto Rico for two weeks. That our motion for continuance was addressed to 'The Honorable Court' and in the motion for amendments we repeated the remarks which we took at the trial in longhand when said incident occurred; that on March 27 we received a letter from Juan Amaral (photostatic copy of which we are attaching) together with several additional sheets 'that should be inserted in the transcript,' and that, although they do not contain all that was said by Judge Gallardo to District Attorney Grajales (notice all the leaders at the beginning of some as well as at the end of others, indicating that the stenographer missed some portions of what was said), it reflects in a general sense what occurred and what was stated by the magistrate regarding the evidence of The People.

"Under those circumstances we appeared in court last Friday, agreeing not to insist on other amendments and instead accepting the version of the notes additionally furnished by Amaral, and with the intention of giving him the satisfaction of hearing from my own lips the recognition of his competence, righteousness as a professional as well as a public employee. We had already complied with that chivalrous duty toward Amaral, and

of Justice to make said investigation and submit a report for further consideration.

The investigation in question having been carried out, and the report thereon having been submitted by the Secretary of Justice and after examining the complete record of that investigation, this Court, by order of February 7, 1958, determined that there was cause for further proceedings against Superior Judge Fernando Gallardo Díaz, under the provisions of § 24 of Act No. 11 of July 24, 1952, Judiciary Act of the

were about to leave the room presided by Judge Gallardo, without District Attorney Grajales having made any objection whatever to our amendments, that is, to the ones made by Amaral, since we did not insist on ours in order to avoid friction with Judge Gallardo, who had already said that he had not used the phrase 'tied up' 'because I am no cowboy,' and, addressing me, in a haughty, violent manner, in a loud tone, popeyed with rage, he said: 'Listen, come here. I had not read this, now I see it for the first time. Here at the end of your motion you call me Judge Fernando Gallardo but do not call me honorable. I don't care if you believe me honorable or not. I am honorable here and anywhere, very honorable.' At that unexpected and abnormal attitude, I calmly answered: 'For heaven's sake, Your Honor. I didn't come here to be mortified by you or much less abused. You shouldn't treat me like that because you are the judge and I owe you respect . . . .'

"At that moment Judge Gallardo stood up, pounded on the table, and leaning forward as if to reach me from the bench, he said to me: 'What I tell you here, I tell you outside and if you want to prove it, come outside.' Whereby he came down by the side in all haste, with his right hand holding on to his waist, at the same time saying: 'Leave me alone, let me go, you're nothing but a *"pendejo"*' whereupon the marshal, the assistant marshal, his secretary, and attorney José R. Fournier endeavored to hold him back while I retorted: 'You are a bigger *"pendejo"* yourself,' without anyone holding me back since I just stood there waiting to be assaulted and to answer the insults, without taking any offensive attitude whatsoever. That the scandal thus formed caused the women and children in the courtroom to cry out and that all the other court officers, especially District Attorney Grajales, and the marshals, protected me from Judge Gallardo at all times, the former inviting me to go with him to his office, to which I agreed, accompanied by attorneys Manuel Torres Reyes and Carlos Borges, who offered me tranquilizers, which I refused to take. That while I was inside District Attorney Grajales' office, together with him, attorneys Carlos Borges, of the Legal Division of the Veterans' Administration, and Manuel Torres Reyes, Judge Gallardo left his office towards the place where my car was parked, and he strolled to and fro exhibiting a revolver on his belt. That later I was able to leave the building when José R. Fournier entered District Atorney Grajales' office and informed me that the hearing

Commonwealth of Puerto Rico, 4 L.P.R.A. § 232[2], and ordered the Secretary of Justice to file the corresponding complaint.

On February 20 the Secretary of Justice filed the complaint against said judge, preferring the following charges:

"FIRST CHARGE.—That on May 3, 1957, while he was acting and discharging his functions as Judge of the Superior Court of Puerto Rico, Bayamón Part, and in said courtroom during the hearing of the Motion for Amendments to the Transcript of

for the approval of the transcript of evidence had been continued and that Judge Gallardo had already resumed the court session.

"Eyewitnesses of these events, according to my best recollection are: attorneys José R. Fournier, Antonio Cortés Cortés, Rafael Rodríguez Ema, district attorney Fernando Grajales, Luis Archilla Laugier, José C. Jusino, Agustina Cámara de San Miguel, José L. Feliú Pesquera, José J. Acosta, Cayetano Coll Pujols, reporter stenographer Juan Amaral, Humberto Alvarez, clerk of the court, attorneys Manuel Torres Reyes and Carlos Borges and other persons, among them, Martínez, the assistant clerk.

"I wish to state that I have information which I believe to be correct as it was given to me by the aggrieved parties, my colleagues Edelmiro Martínez Rivera and his son, Edelmiro Martínez, Jr., that on occasion when the former appeared in a suit before Judge Fernando Gallardo Díaz, he was challenged· and invited by said magistrate to go out and fight, to which colleague Martínez Rivera refused so as to avoid a personal encounter with a magistrate. Witnesses: attorneys E. Martínez Rivera and Edelmiro Martínez, Jr.

"I pray that an immediate investigation of these facts be ordered; that reporter stenographer Juan Amaral be summoned to testify and furnish a transcript of the hearing held on May 3, 1957, and that the respondent be suspended from office and salary until this complaint is heard, so that all the officers of the court and attorneys can freely tell the truth of what occurred on that occasion without fear of reprisal on Judge Gallardo's part."

[2] "If the Supreme Court shall determine that there is cause for further proceedings, it may request the Secretary of Justice or other officer of the Court to prosecute the cause. The Secretary of Justice also, of his own motion or by direction of the Governor, may initiate a prosecution for the removal of a judge and shall then act as prosecutor. Prosecution shall be by complaint returnable to the Supreme Court charging the judge with immoral conduct or neglect of judicial duties. The Court shall accord the parties an opportunity to be heard, together with their witnesses and the court may, in its discretion while the proceeding is pending, suspend the judge from performing the duties of his office and receiving his salary. If the Court shall find the charges, or any part of them, sustained, it may censure or suspend the offending judge or remove him permanently from his office as it shall determine the most appropriate penalty under the circumstances."

24

Evidence filed by attorney César Andréu Ribas, in criminal case No. M-56-251, entitled 'The People of Puerto Rico v. Miguel Angel Marín Canals,' for a violation of § 6 of the Weapons Act of Puerto Rico, the respondent judge Fernando Gallardo Díaz, who was presiding said hearing, observed an immoral conduct unbecoming a magistrate, consisting in that, when calling the attention of César Andréu Ribas as to the manner in which the latter drafted the said Motion for Amendments, they exchanged words in a defiant tone and attitude, as a result of which the respondent judge violently came down from the bench, using both obscene and offensive language in a loud tone, giving rise to the ensuing disorder and the interruption of the proceedings that were being conducted in court and the intervention on the part of several attorneys and other officers to prevent physical assaults between respondent and Mr. Andréu Ribas.

"SECOND CHARGE.—The respondent, Fernando Gallardo Díaz, acting as judge of the Superior Court of Puerto Rico, Bayamón Part, on or about May 6, 1957, observed an immoral conduct unbecoming a magistrate, consisting in that he drafted a letter to be signed by Armando Santini, reporter in Bayamón for the newspaper 'El Imparcial' and addressed to the editor of said newspaper, Antonio Ayuso Valdivieso, and dictated it to the court stenographer, Juan Amaral, and caused to be copied in said letter part of the official transcript of the stenographic record of the incident to which the first charge refers; that the respondent undertook and succeeded in having it signed by Armando Santini, whom he summoned by telephone to appear in his office for that purpose; that said letter contradicted the information concerning the incident referred to in the first charge and which was published by 'El Imparcial' in its issue of May 6, 1957, under the headline 'Judge Causes Scandal in Court and Challenges Attorney'; that in drafting said letter respondent set forth therein several false facts, namely: that reporter Armando Santini was present in Bayamón and witnessed the afore-mentioned incident between respondent and Mr. César Andréu Ribas, that Armando Santini had read the transcript of the stenographic record of said incident; and that Armando Santini had dictated the said letter, the respondent being aware of the falsity of said statements; that said letter was sent by the respondent judge, to Mr. Ayuso Valdivieso via Armando Santini himself and copy thereof was made public by respondent,

reading it in open court while he presided the session held on May 6, 1957, after respondent had stated orally before reading the letter the false fact that it had been written by Armando Santini himself, all of which is injurious to the prestige, dignity, and good name of the court and administration of justice."

The Secretary of Justice prayed in the complaint that after the proper procedure, an order be entered "removing the respondent permanently from his position as Judge of the Superior Court of Puerto Rico or in default thereof, imposing the most appropriate penalty under the attendant circumstances," and that in the exercise of our discretion respondent be suspended from office and pay, pending a final determination of the removal proceeding.

By order of February 21, 1958, entered after examining the complaint, this Court suspended the respondent judge from office and pay, pending a final determination of the case, making such order effective at once.

After the complaint was duly notified, on February 24 the respondent judge appeared represented by his attorneys, Benjamín Ortiz and Yamil Galib, and filed a motion to dismiss the complaint on the following grounds:

"1.—The facts set forth in the two charges are not sufficient to prove immoral conduct on the part of the respondent.

"2.—The statute on which this proceeding and the complaint are based is unconstitutional and deprives the respondent of due process of law, since said Act (4 L.P.R.A. § 232) empowers this Court to decide the case conclusively, notwithstanding the fact that this Court has already determined previously that there is cause for the complaint and notwithstanding the fact that this same Court which ordered the filing of the complaint will also decide the case."

On the same date, separately, he filed an answer to the complaint, denying, in general terms, "each and everyone of the facts alleged in the two charges.'

The hearing of the complaint commenced on March 19, 1958, with the full Court in attendance, except Mr. Justice Pérez Pimentel and Mr. Justice Saldaña, who by voluntary

personal decision and as soon as Mr. Andréu Ribas filed the complaint, completely disqualified themselves to act in the present proceeding. The hearing continued during March 20, 21, 24, and 25, ending on midnight of this last day. During the other days night sessions were also held. The respondent was present personally and assisted by counsel, and the Secretary of Justice was represented by José C. Aponte and Guillermo A. Gil, two of his special prosecuting attorneys at large.

The respondent's motion to dismiss was argued by the parties in separate briefs which were timely filed. It was denied by verbal order on March 19, during the session of that day and before commencing the introduction of evidence. (Tr. p. 10.) In view of the outcome of this case it is unnecessary to set forth now the grounds of said order.

Both parties introduced abundant oral and documentary evidence. Lengthy briefs were presented on the merits and the case was submitted to our consideration.

Our Constitution, in its Art. V, § 11, imposed on us the duty or obligation to pass upon those complaints filed against the judges of the other courts for the causes and pursuant to the procedure provided by law. This procedure was regulated by § 24 of the Judiciary Act of 1952, wherein it is ordered that if this ". . . Court shall find the charges, or any part of them, sustained, it may censure or suspend the offending judge or remove him permanently from his office or it shall determine the most appropriate penalty under the circumstances."

In order to comply with that duty we have carefully examined all the evidence offered and the written arguments of the parties. In its essential aspects, the evidence of one side is in strong conflict with that of the other side. It is really amazing to find such conflicting testimony on important parts of the evidence. We cannot understand these great differences of perception in persons who had equal opportunity to observe the facts closely. Wishing to give the parties the

fullest opportunity to be heard, the Court permitted each one to introduce a number of testimonies whose substance had been previously established by others. As a result of such examination, and after considering all the pertinent elements of evidence, we resolved the conflict in the evidence and made the following

FINDINGS OF FACT—First Charge

1. Respondent Fernando Gallardo Díaz was appointed District Judge of the Judicial District of Bayamón on June 11, 1945, which appointment became effective on June 16, 1945, date on which he took oath and assumed office. When the district courts were abolished by virtue of the Organic Act of the Judiciary of Puerto Rico of 1950, effective July 1 of that year, respondent went on to occupy the position of Judge of the District Court of Puerto Rico, Bayamón Part. With the reorganization of the judicial system effected in 1952, he went on to occupy that of Judge of the Superior Court of Puerto Rico. Petitioner's Exhs. 1 and 2.

2. In October 1956 two informations were filed in the Bayamón Part of the Superior Court, against Miguel Angel Marín Canals, for violations to the Weapons Act. The first, a felony, under No. G-56-198, concerning § 8 of said Act. The second, a misdemeanor, under No. M-56-251, for violation of § 6, consisting in having carried a pistol without having previously obtained a license issued by the Chief of Police of Puerto Rico. The cases were jointly submitted to trial presided by Superior Judge Fernando Gallardo Díaz, on January 24 and 25, 1957, with District Attorney Fernando Grajales representing The People, and César Andréu Ribas and Gilberto Padró Díaz representing defendant. In the felony, No. G-56-198, tried by a jury, the verdict was of acquittal. The misdemeanor, No. M-56-251, was decided by said judge, who found defendant Marín Canals guilty and sentenced him to serve six months in jail. Petitioner's Exhs. 3 and 4.

3. In the course of the trial, and on the first afternoon, the following incident took place:

"District Attorney: Right now we are going to raise a question . . . .

"The Court: Will the jury leave the room and do not comment the case among yourselves, nor with anyone, nor form an opinion.

"District Attorney: Your Honor, we believe . . . . We ask the witness to withdraw . . . .

"The Court: Certainly, will the witness step outside.

"District Attorney: We believe, Your Honor, that what the defense is doing in this case as part of its theory and introduction of evidence is presenting exonerating statements of a third person in accordance with the question that counsellor has asked the witness at this very moment. The line of questions is directed to bring through this witness exonerating statements which arose after the police intervened in this case. We understand that that is inadmissible evidence.

"The Court: Up to now nothing brought is inadmissible. Your Honor mentioned that and this is what the witness told the District Attorney.

"District Attorney: We believe that all those exonerating statements are not admissible in evidence.

"The Court: Up to now he has said that he traveled in the car and went to Palo Seco and the police came and took this man in custody. What the witness has said up to now is perfectly admissible. The other witness said that the defendant told him who had got him in the mess: he said he did not know. The other witness said that the only one who had entered the car was So-and-So.

"District Attorney: Everything that the witness testified concerning Maldonado . . . .

"The Court: The witness began to say something and it was the attorney himself who prevented him from saying it.

"District Attorney: Since the witness was there.

"Defense: Colleague, that is very premature, to anticipate what the witnesses are going to say. Very premature indeed.

"The Court: In this case were there any more people around? I must decide the other case. There were a lot of people there and the district attorney merely took the testimony of the two policemen.

"District Attorney: We have the two policemen and we investigated besides. I have taken steps to get other witnesses.

"The Court: A district attorney should presume and anticipate that when an event occurs early at night and there are many people present, the defense will tell the jury 'Gentlemen, how is it possible that this event occurred in a public place and that the only witnesses that the district attorney produces are two policemen, when that business place was full of witnesses?'

"Your Honor (addressing the district attorney) could have investigated those who were in the bar. You could have asked them if they saw anything. 'If, for example, they say that they saw nothing, write down that they do not know anything and under those circumstances, in a case like this, they can not come into court afterwards, and say they did see, once having testified that they did not see anything . . . . If it is possible. A citizen should tell the truth of what he saw. If he can, that is enough. But cases can not be conducted that way.

"District Attorney: We say, Your Honor, they can be conducted with one policeman as witness.

"The Court: They can be conducted, but the one who is going to judge has to know about that.

"District Attorney: We took all the pertinent steps.

"The Court: That is not enough. If someone told you he did not know . . . .

"District Attorney: I asked all the witnesses during the investigations and the defendant who did not want to testify.

"The Court: That is his own right.

"District Attorney: . . . Not even El Cano, he was asked but not for one moment did he admit having seen anything.

"The Court: Why did you not write it down? If he went to the office of the district attorney, I would take down his testimony and 'tied him up.'

"District Attorney: El Cano did not come to the office right away. It was approximately a month or more after seeing the defendant, that the latter wanted us to take that testimony. Defendant wanted to have El Cano's testimony. But this case occurred on October 7 and it was investigated on the 7th or 8th.

"The Court: You should make everyone come. I used to take 60 testimonies just to use 3. I knew it. I would write it down.

"Defense: I am going to request the court to strike the district attorney's remarks concerning the fact that El Cano went to his office.

"District Attorney: I take back everything I said.

"The Court: The jury is not here now.

"Defense: Your Honor, in this same week colleague Grajales was contradicted. Since what he is saying is from memory I do not want it included in the record.

"District Attorney: Well . . . . I take back . . . .

"The Court: What do you take back?

"District Attorney: Everything he said when he was in my office.

"The Court: Marshal, bring in the jury. The jury is complete and it is the same. Defendant and attorneys are present. Call one witness. Let us have the witness who was testifying. The defense may continue questioning him." (Petitioner's Exh. 7.)

4. Defendant took an appeal from the judgment of conviction and on the same date, January 25, 1957, he requested the court to order the stenographer to prepare his notes taken during the trial. It was so ordered by the court on January 29, notifying Juan Amaral, court stenographer. Petitioner's Exh. 3, folios 8 and 9.

5. On March 7, 1957, stenographer Amaral filed a transcript of the evidence, and a hearing was set for its approval for the following May 3, after several postponements. Petitioner's Exh. 3, folios 14, 15 16, 21, 22, and 23.

6. On March 25, Mr. César Andréu Ribas, representing defendant Marín Canals, filed in the office of the clerk of the Superior Court, Bayamón Part, a motion whose text literally reads thus:

"In The Superior Court of Puerto Rico, Bayamón Part.—The People of Puerto Rico v. Miguel Angel Marín Canals, defendant.—Crim No. C-56-198 M-56-251 For: Violation of the Weapons Act (Felony) (Misdemeanor) *Motion for Amendments in the Transcript of Evidence.*—Defendant appears through his undersigned attorney and sets forth: 1.—That he received copy of the transcript of evidence prepared, certified, and filed by the

reporter stenographer Juan Amaral, and as it is pending approval by this court, for the purposes of perfecting the appeal filed against the judgment entered by the court of law, defendant submits the following amendment: 1.—When District Attorney Grajales finished presenting his evidence and after policemen Aureliano Díaz and Manuel Ralat had testified, Judge Fernando Gallardo asked the District Attorney Grajales: 'Is that all the evidence?' and upon the district attorney answering affirmatively, the judge ordered the marshal to remove the jury from the courtroom, and there ensued a lengthy dialogue between the judge and the district attorney, more or less in the following terms:

" 'Hon. Judge: Do you mean to tell me that this case occurred in a bar there in Cataño, which is two minutes from here, and you only bring the two policemen to testify, and you did not take the testimony of the owner or the manager of the bar or of any other person? Remember that I have the responsibility of deciding one of these two cases, that one is felony and the other misdemeanor, and that investigation is very deficient. When I was district attorney in Guayama and in San Juan, and we had a case like this, I was not satisfied with what the police would tell me but I would go to the place, take the testimony of all the witnesses and anyone who might have been present, even if it was just to tell me that they did not know anything about the case. In that way the defense could not bring those witnesses to say that they saw this or that because I already had them tied up with the testimony that they knew nothing.

" 'District Attorney Grajales: That is all the evidence for The People, and that is the case. I can do nothing more.

" 'Hon. Judge: Well you see, now the defendant brings the manager of that place and other persons who witnessed the arrest, he has them outside as witnesses and The People could have investigated them before. Recess.'

2.—"That these statements were made by the magistrate and the district attorney during the trial; that they form part of what occurred and should be wholly transcribed and yet have been unduly stricken when they should be inserted in the proper place in the transcript of evidence.

3.—"That during the recess the counsel for the defendant approached Mr. Amaral, and later in the latter's own office, managed to have the remarks which do not appear now in the

transcript read to him, whereby *he has reasons to believe that this has not been nor happens to be an involuntary omission in transcribing his notes but rather that those remarks were stricken from the transcript after the court knew of defendant's intention to appeal as stated in open court, upon requesting bail to do so.* For these reasons, defendant urges this court to order reporter stenographer Juan Amaral to insert in the proper place in the transcript of evidence (p. 48, before adjourning for lunch and after having introduced in evidence the pistol and the bullets, without defendant's objection) all the words, phrases and remarks previously transcribed and proposed as amendments by the defendant, which were said in open court at the trial by Judge Fernando Gallardo Díaz, and addressed to District Attorney Grajales, as well as the ones made by the latter, so that the complete transcript be sent to the consideration of the Hon. Supreme Court of Puerto Rico to which defendant is entitled. San Juan, Puerto Rico, March 21, 1957. (Signed) C. Andréu Ribas, counsel for defendant-appellant." (The underscoring of part of paragraph 3 was made by the respondent judge, with a blue pencil, "the Monday or Tuesday following the incident . . . in the office of the clerk of the court."—R. 1106). Petitioner's Exh. 3, folios 18–20.

7. In the calendar of cases for Friday, May 3, 1957, there were also included besides the incident of approval of the transcript of the Marín Canals case (which was the third in the list), other 47 cases, among them: 15 divorces by default, 8 unlawful detainers in their first hearing, 5 motions in adversary proceedings, 5 contempts in alimony suits, 2 pronouncements of sentences, and 12 other ex-parte records and motions of different kinds. The calendar contained the names of some 25 attorneys for the respective litigants, petitioners or defendants, and the name of District Attorney Grajales, in the cases in which The People was one of the parties. Respondent's Exh. D. About 44 cases were heard. Petitioner's Exh. 5, folios 187–197, Minute Book No. 71. On that morning the courtroom of the Bayamón Part of the Superior Court, presided by the respondent judge, had a large audience; almost all the seats for the public were occupied; some of the

attorneys remained standing, and some were compelled to remain in the hall of the court.   R. 51, 255, 326, 538, 592.

8. After calling the case of Marín Canals on that morning for the approval of the transcript of evidence, the following dialogue took place between Judge Gallardo Díaz and Mr. César Andréu Ribas:

"DEFENSE:  Mr. César Andréu Ribas:  I proposed some amendments to the stenographic record, which are attached to the record of this case.   Your Honor will remember that on the day of the trial and after having presented the testimony of the two policemen whose names appeared at the back of the information, Your Honor ordered the withdrawal of the jury and asked District Attorney Grajales 'if that was the evidence for the case'; that was after he presented in evidence the revolver and bullets.   And then Your Honor addressing the district attorney, made certain remarks, which I took down Your Honor, as fast as possible in longhand because I am no stenographer, which briefly are the following and which I have included in the 'Motion for Amendments in the Transcript of Evidence';

"THE COURT:  Hon. F. Gallardo Díaz,

"JUDGE:  Was that in the absence of the jury?

"DEFENSE:  Yes, Your Honor.   I shall read the incident.   'Is that all the evidence?' and upon the district attorney answering affirmatively, the judge ordered the marshal to remove the jury from the courtroom, and there ensued a lengthy dialogue between the judge and the district attorney, more or less in the following terms: Hon. Judge: Do you mean to tell me that this case occurred in a bar there in Cataño, which is two minutes from here and you only bring the two policemen to testify, and you did not take the testimony of the owner or the manager of the bar or of any other person?   Remember that I have the responsibility of deciding one of these two cases, that one is felony and the other misdemeanor, and that investigation is very deficient.   When I was district attorney in Guayama and in San Juan and we had a case like this, I was not satisfied with what the police would tell me, but I would go to the place, take the testimony of all the witnesses and anyone who might have been present, even if it was just to tell me that they did not know anything about the case.   In that way the defense could not bring those witness-

es to say that they saw this or that because I already had them tied up with the testimony that they knew nothing . . . .

"THE COURT: But I have never in my life used the words "tied up' . . . .

"At this moment the stenographer addresses the Hon. Judge and says: The incident is transcribed, and furnishes him with the original copy, because on March 27, 1957 he had already served copies thereof to the parties' attorneys.

"THE COURT: . . . I remember there was something along that line.

"DEFENSE: If Your Honor will allow me to continue reading. Later Mr. Grajales answered him: 'That is all the evidence for The People and that is the case; I can do nothing more.'

"I received a copy of the transcript of the incident, accompanied with a letter from stenographer Amaral, who is an officer for whom I have great respect, and now I would like to say it publicly, that I regret this whole incident, and with Your Honor's leave, I want to state I had and still have great desire to say here publicly before the court, my opinion of Mr. Amaral . . . .

"Then I read the transcript of the incident that I have alleged was omitted in the transcript of evidence, and I saw that the incident transcribed by Mr. Amaral is more or less the same thing that I took in longhand, but with more details, and I agree with the incident.

"But I also want to say that I must watch for the rights of my client on appeal. Your Honor, that is why I filed that motion that I have just read requesting amendments to the stenographic record.

"Later I received a letter from Mr. Amaral, Your Honor, to which were attached pages 79, 79A, 79b, 80, and 81, in which letter Mr. Amaral actually complains and tells me as follows:

'I am enclosing the additional sheets that should be inserted in the transcript of evidence of the Marín Canals case, containing the incident that I involuntarily and inadvertently omitted to transcribe. I deeply regret it because that omission has caused Your Honor to rashly'—there is a parenthesis—which says 'of this I am sure, because we have been good friends,' and continues 'set forth certain remarks in your motion for amendments. When we recall what we talked about on January 25 the truth will be clarified and your Honor, with that noble gesture that characterizes you, shall request that they be stricken from the record. Until then, I remain, Yours truly.'

"DEFENSE: Therefore, I accept in the first place that it was an involuntary omission on Mr. Amaral's part. I also accept as correct what has been transcribed in these pages that Mr. Amaral sent me with his letter. That is all that I had to say concerning the amendments.

"Now I would like to say something with regard to Mr. Amaral, because I wanted to say it here before the court, its officers, the public and the members of the bar, and that is the following: 'I hold Mr. Amaral in high esteem as an officer, and in all his capacities; he is a correct citizen, a correct and honest officer and I had not answered his letter because I wanted to say it here before the court.'

"THE COURT: *I had never read this or knew that it had happened until this very moment. But I see here that Your Honor in referring to me calls me 'Judge Fernando Gallardo,' 'Mr. Judge,' and I do not care if I am not called 'honorable' because I know that I am honorable, whether you think so or not . . . .*

"DEFENSE: *With apologies to the court . . . . I did not come here so that Your Honor, taking advantage of your position as judge should come and tell me those things . . . .*

"THE COURT: *Well, I say it here and outside of the court and anywhere . . . .*

"DEFENSE: *That's just what I want . . . . Come on . . . come on . . . .*

"THE COURT: Recess." (Petitioner's Exh. 3, folios 3–35.) (Italics ours.)

9. During the preceding dialogue, the judge was sitting down; Mr. Andréu Ribas was standing, facing the clerk's table. Pounding on the desk, the judge called a recess, he suddenly stood up—R. 289—turned to his right, came down from the bench and began to walk towards Mr. Andréu Ribas who was standing near the table of the court attorneys. R. 250, 323, 335. Both were excited and nervous. Then marshal Juan Ramón Rivera Ayala, "Fearing that something might happen"—R. 552—stopped Judge Gallardo Díaz and "held him by the arms"—R. 358, 499, 882—preventing him from advancing. R. 525. The assistant marshal and "a great many attorneys" also intervened with the judge, advising him

to keep calm—R. 529, 553—and pushed him or shoved him —R. 70, 453, 499—towards a small hallway that leads to the jury room; just as they had led him into that hallway and still being near the threshold of the door leading to that hall, Judge Gallardo Díaz said to those who were holding him: "Let me go, he's just a *'pendejo'* "—R. 290, 500. To these words respondent Andréu Ribas, with whom District Attorney Grajales and other attorneys had intervened—R. 249— retorted: "You're a bigger *'pendejo'* yourself." R. 500.

10. The judge was taken to his office where he took an Equanyl. R. 114. District Attorney Grajales took hold of Andréu Ribas by the arm, seated him in an armchair and later took him to his office; there he offered him a tranquilizer but he did not take it. R. 328. The judge left his office and came down from the second story of the building towards the place where he had parked his car with the "intention of going to my automobile and getting the revolver from the dashboard and bringing it with me," he changed his mind and returned without the revolver, resuming the court session. R. 1115. From the office of the district attorney Andréu Ribas went to San Juan, where he attended other cases. R. 49, 328.

11. As a result of the incident between judge and attorney, the proceedings were interrupted for some time. Some witnesses testified that the interruption lasted forty-five minutes—R. 376—others thirty—R. 537—others twenty-five —R. 532—others "not less than fifteen,"—R. 362.

No real panic arose at the moment that judge and attorney, excited and nervous, in a tone that everyone could hear, addressed each other in offensive or provoking terms; however, it is inferred from all the evidence that officers, attorneys, litigants of both sexes and the public gathered therein (among which was a 7 year-old girl—R. 817) feared that a serious and imminent personal encounter between the

magistrate and the attorney might follow;[3] part of the public abandoned its seats, some attorneys withdrew to the hallways; two groups intervened with them; the usual order and composure were impaired and a state of alarm and confusion was momentarily created in that court of justice. R. 51, 203, 291, 346, 361, 368, 375, 514, 545, 551, 556, 560, 564, 568, 571, 581, 591, 600, 610, 660, 661, 883, 888, 891, 892, 1082.

12. In 1942 there arose a relationship of intense personal enmity between respondent Judge Fernando Gallardo Díaz, and the attorney César Andréu Ribas, which, with apparent periods of indifference, has persisted through the years, and made manifest in different ways. Petitioner's Exh. 15 at 57–62; Respondent's Exhs. A, B, F, J, K, and L.

13. In the transcript of evidence prepared by stenographer Juan Amaral, and which he filed on March 7, 1957, said stenographer failed to include the dialogue between judge and district attorney, which is inserted in the preceding Finding No. 3 and which occurred on the afternoon of January 24, 1957, in the absence of the jury, at the trial against Marín Canals and after the district attorney announced the close of his evidence; the respondent judge did not intervene in any form in the omission of that dialogue. Petitioner's Exh. 6; R. 398, 431, 469, 471.

### Second Charge

14. Armando Santini Berríos, reporter of the daily newspaper "El Imparcial" in Bayamón, did not witness the incident of Friday morning, May 3, 1957. When it occurred he was in the building of said newspaper located in San Juan. He returned to Bayamón around noon and there, for the first time, he received information from a business acquaintance

---

[3] The letter of May 6, dictated by the judge himself upon Santini's request—petitioner's Exh. 12—in part reads: "According to the district attorney the attorney was armed with a revolver or pistol, but although the judge, according to his own report, was not armed, *he did not become frightened, but the attorneys intervened and the matter had no further consequences.*"

concerning the events of that morning in the Superior Court. R. 681. After one o'clock, and after conferring with one of the assistant clerks of the court, he visited Judge Gallardo Díaz in his office for the purpose of obtaining from the magistrate some information on the matter, and the following conversation took place between them:

*Santini:* "I was out; when I arrived here I was told that César Andréu challenged you and they have given me the details. Did César Andréu insult you at all in court? I want your account, what you know, in order to inform 'El Imparcial.' "

*Judge Gallardo Díaz:* "Never mind. I don't want to make any statement or to say anything."

*Santini:* "Look, it's just that shortly he will be saying something else."

*Judge Gallardo Díaz:* "Look here, what they told you downstairs is the truth."

*Santini:* "May I use your telephone to call up 'El Imparcial'?"

*Judge Gallardo Díaz:* "Certainly." Petitioner's Exh. 15 at 30; *cf.* R. 1112.

15. Santini Berríos talked over the telephone with Barbosa Aquino, employee of "El Imparcial," transmitting to him the information which he had obtained on the incident. Respondent's Exh. Ñ, R. 1117.

16. On the following morning, Saturday, May 4, stenographer Juan Amaral prepared a transcript of the stenographic notes that he had taken concerning the incident of the previous day between judge and attorney. Petitioner's Exh. 3; R. 442, 443. Said stenographer delivered the transcript to Judge Gallardo Díaz on that same morning while said judge attended a luncheon sponsored by the committee on the patronal festival of Bayamón, in honor of all the attorneys of Bayamón. Many attorneys and also Santini Berríos attended that luncheon. On that occasion, one of the attorneys, to whom Santini Berríos was very close, read aloud the transcript of the incident prepared by stenographer Amaral. R. 502, 685, 901, 986, 1121. Santini had it in his hands and scanned it. R. 986.

17. In the issue of Monday, May 6, 1957 of "El Imparcial" whose public circulation began on the previous Sunday afternoon, there appeared an information with the following headlines: "JUDGE CAUSES SCANDAL IN COURT AND CHALLENGES ATTORNEY."[4] Petitioner's Exh. 13.

Judge Gallardo Díaz read that information at his home on the very night of Sunday, May 5. He considered that the account of the incident between him and Andréu Ribas that the newspaper published was incorrect, that it did not agree with what reporter Santini Berríos had transmitted via telephone from his office and thinking of the possibility that Santini Berríos might have transmitted to the paper, the very

---

[4] The text of the information reads as follows: "JUDGE CAUSES SCANDAL IN COURT AND CHALLENGES ATTORNEY.

Accusing Fernando Gallardo Díaz of behaving in open court in a manner unbecoming a judge and a gentleman, upon causing a scandal uttering obscene words without any respect whatever for the women and girls present in court, and having challenged him in a violent attitude, Mr. César Andréu Ribas, attorney at law, intends to bring to the Grievance Committee of the Bar Association the same complaint he has already filed before the Court Administration and the Supreme Court. The incident, which created a state of panic and confusion in the Superior Court of Bayamón when women and children vacated the courtroom in hasty departure, was produced on Friday. The source of this affair is attributed to the fact that Mr. Andréu Ribas did not call Judge Gallardo 'honorable' in a motion requesting to include in the stenographic record of the prosecution for violation of the Weapons Act against engineer Miguel Angel Marín Canals, of Yabucoa, certain remarks in which Gallardo rebuked District Attorney Grajales, accusing him of what he at that time called 'deficiency in the investigation of the case.'

"After engineer Marín Canals was acquitted by the jury in the case of felony and sentenced to six months in jail by Judge Gallardo, Andréu appealed to the Supreme Court, and upon receiving the transcript of the evidence he found that there had been omitted the aforesaid remarks of Judge Gallardo against District Attorney Grajales, whom he had censured because in investigating the case he was satisfied with the testimony of policemen Ralat and Díaz, and did not go to Cataño, to the place where the events occurred.

"Friday was the day set for hearing the said motion to amend the stenographic record and at the commencement of the session Andréu Ribas stated that a short time after filing his motion for amendments he received from stenographer Juan Amaral a complementary three-page transcript which he had involuntarily omitted and which were precisely Ga-

same Friday, via another telephone, the information published changing "everything that he had told me,"—R. 1122— he got in touch with Santini Berríos by telephone. The latter told him that "he was furious and . . . that it was not the first time that he had given Barbosa Aquino some information and the latter had changed it and that people were already calling him a liar." R. 1122. Then Santini Berríos asked the judge to draw up a letter addressed to Mr. Ayuso, his employer, "telling him everything, and . . . precisely to include the last part contained in the papers which had been read at the market place," that is, at the luncheon of the previous Saturday. R. 1122, 1123.

---

llardo's remarks. Since District Attorney Grajales made no objection whatever, Andréu had phrases of recognition for stenographer Amaral's integrity, and he was just about to leave the court when a dialogue was produced in more or less the following form:

"*Gallardo:* Listen (to Mr. Andréu Ribas), come here. I had not read your motion and I see that here you do not call me honorable, but Judge Gallardo Díaz. I do not care if you consider me honorable or not, because I know that I am honorable, very honorable.

"*Andréu Ribas:* For heaven's sake, Your Honor. I did not come here to be abused, nor do I have the obligation to call you honorable. There is nothing disrespectful in my calling you judge and you should not take advantage of your position as judge to rebuke me in court, because I have not done anything to annoy you.

"*Gallardo:* Well, I am not telling you just because we are in courtroom and I am judge. Come on outside and see.

"*Andréu Ribas:* I am coming right away, because now this is different.

"At that moment Judge Gallardo turned in his chair and stepped down with the apparent intention of going out, but Ana Delia, his secretary, and the marshal held him and while they tried to take him to his office, Gallardo shouted 'Let me go, leave me alone, he's nothing but a '*pendejo!*' to which Andréu Ribas, surrounded by District Attorney Grajales and attorneys Manuel Torres Reyes, José C. Jusino, Agustina Cámara de San Miguel, Luis Archilla Laugier, and José Acosta, retorted: 'You're a bigger '*pendejo*' yourself!'

"While that skirmish between judge and attorney was going on, a group of ladies who were in courtroom tried desperately to leave the court, crying out in order to gather their children and a state of confusion and panic was produced, which fortunately did not cause any accident or injuries. Finally, Judge Gallardo was accompanied to his office and Mr. Andréu Ribas to his automobile, leaving without his motion being finally decided."

Next morning, Monday, May 6, Judge Gallardo Díaz, in his office, in the absence of Santini Berríos, dictated to stenographer Juan Amaral and the latter typed the letter that said reporter had asked the judge to dictate to him. When Santini Berríos arrived at the judge's office, the latter handed him the letter; Santini Berríos read it, signed the original and a copy that he left with the judge. Santini Berríos asked that a postscript be added to the letter because "I wanted to appear as having dictated the letter." The judge told him that "It was up to him" (to Santini) and he called the stenographer and Santini Berríos explained to him how he wanted the postscript. Amaral drafted the postscript. Afterwards

---

[5] The letter, petitioner's Exh. 12, reads:

"Bayamón, Puerto Rico, May 6, 1957.—Mr. Antonio Ayuso Valdivieso, 'El Imparcial,' San Juan, Puerto Rico.—Dear Mr. Ayuso: You know that I have been your paper's reporter in Bayamón for many years and I have always been proper and honest with the paper and with everyone and I am a reliable person. But it happens that in today's 'El Imparcial' and on page 4 there appears an information entitled 'Judge causes scandal in court and challenges attorney.' During the incident to which that information refers there was no other newspaper reporter in Bayamón but myself, and I immediately telephoned editor Barbosa Aquino and gave him all the details on the matter. Much to my surprise, upon reading the information that appears in the said page on the question at issue, I found that the facts set forth were not the ones I supplied, which were and are the true ones, but a set of lies which harm the paper, since everyone who sees me and has read the said information only says: What a liar you are, Santini! I was in court and what happened is different from what you wrote. I have to give an explanation to these people who so address me and it is very unpleasant.

"I informed Barbosa Aquino that Mr. Andréu Ribas had challenged Judge Gallardo in open court as a result of a certain argument concerning the approval of a stenographic record in a case of carrying weapons which is being prosecuted against Miguel Angel Marín. I informed him furthermore, that it was attorney Ribas who stirred the scandal and when the judge decreed a recess the attorney went close to District Attorney Grajales in a corner where the attorneys stand. According to the district attorney, the attorney was armed with a revolver or pistol, but although the judge, according to his own report, was not armed, he did not become frightened, but the attorneys intervened and the matter had no further consequences. There was no such panic as the paper describes in its information or in any other form. That information also says that the judge's secretary intervened, when that secretary had been sick at home for several days. In short, Mr. Ayuso, the information which appears in 'El Imparcial' is

Santini Berríos took leave from the judge's office. Petitioner's Exh. 15 at 81 and 82; R. 786, 787, 1123, 1124.[5]

18. At the commencement of the court session on Monday, May 6, the respondent judge, in open court, and in the presence of two district attorneys, three attorneys, the clerk, the marshal, and 36 jurors, expressed himself in the following terms:

"The court wishes to state and make it a part of the minutes, that there appears in today's issue of the newspaper 'El Imparcial' an information which is a discredit, if it were true, to this court. It is an information entirely lacking in truth. At the beginning I thought that the reporter for 'El Imparcial' in Bayamón had given that information. But he has explained to me that he gave certain information and it is the opposite of what appears in 'El Imparcial' and that it came from the newspaper, that he does not know who wrote it, although he got in touch with the editor Barbosa Aquino, to whom he gave the information. But for the court's satisfaction, the reporter of Bayamón himself has written today a letter to the editor of the newspaper objecting to how the facts were misrepresented . . . . And

very different from the truth and it appears more as an invention of the mind. I have read the record taken by the stenographer on the spot and I am going to copy it, for your information, as follows:

" 'THE COURT: I had never read this, or knew that it had happened, until this very moment. But I see here that Your Honor, in referring to me, calls me "Judge Fernando Gallardo," "Mr. Judge," and I do not care if I am not called "honorable," because I know that I am honorable, whether you think so or not . . . .

" 'DEFENSE: With apologies to the court . . . I did not come here so that Your Honor, taking advantage of your position as judge should come and tell me those things . . . .

" 'THE COURT: Well, I say it here and outside of court and anywhere . . . .

" 'DEFENSE: That's just what I want . . . . Come on . . . . Come on . . . .

" 'THE COURT: Recess.'

"I am writing you this letter and leaving it with Héctor in 'El Imparcial' as it is hard for me to see you personally, since you do not have a regular time for going to the office.

"I am going to give a copy of this letter to Judge Gallardo, so that he can see that the reporter for 'El Imparcial' in Bayamón has not been and is not a liar. Sincerely yours (signed) Armando Santini.—Postscript: This letter is typewritten because Mr. Amaral, the stenographer, has been kind enough to do it for me, exactly as I dictated it to him."

there it was all changed and we have seen in the newspaper an information based on false facts. That is no sign of power, because people are going to believe that he as well as the paper are liars. And that is why he makes such request of the editor.

"We want to make these statements because whoever reads "El Imparcial' might believe that the presiding judge of this court is a gangster and I have never been a gangster nor anything like a gangster, nor have I been a gangster attorney nor associated with gangsters. On the contrary, I pride myself of having been District Attorney of Guayama and District Attorney of San Juan.

"Of course, the information published in the newspaper in the manner it appears written, shows that it seems to have been inspired by someone associated with gangsters, because those things are usually the product of that kind of people.

"The letter reads thus: The Hon. Judge reads the letter starting from 'Bayamón, Puerto Rico,' up to where it says 'I have dictated it.'" Petitioner's Exh. 5 and Exh. 14, folios 197–98.

Up to here are the findings of fact made by the Court which we deemed to be pertinent to the preferred charges and which we have drawn from such testimonies, in whole or in part, as we have believed worthy of credit and from the probatory force which we have given each piece of documentary evidence.

We shall set forth in separate opinions—as we stated in our order of November 13, 1958, ordering the dismissal of the complaint and the respondent's reinstatement in his position as Superior Judge, upon the Court being unable to reach a majority agreement on the matter—the different views as to whether the facts set forth in the preceding findings are sufficient to consider that the charges, or part of them, have been proved or not and, if in the affirmative, whether under the present circumstances the respondent judge should be censured, suspended or removed permanently from office.

Opinion of MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ, in which MR. JUSTICE SERRANO GEYLS concurs.

San Juan, Puerto Rico, March 12, 1959

I am of the opinion that the charges preferred in the complaint were sufficiently supported by the evidence and that the facts warranted, if not respondent's removal, his suspension from the office of Superior Judge. I shall set forth my reasons:

## I

Section 1 of Art. V of our Constitution provides that: "The judicial power of Puerto Rico shall be vested in a Supreme Court, and in such other courts as may be established by law." Section 11 of that same Art. V provides that the Justices of the Supreme Court may be removed for the causes and pursuant to the procedure established in section 21 of Art. III of the Constitution (impeachment proceeding), and that "The judges of the other courts may be removed by the Supreme Court for the causes and pursuant to the procedure provided by law."

The Legislative Assembly of Puerto Rico, in the exercise of its power granted by § 2 of that same Art. V, establishing, by virtue of Act No. 11 of July 24, 1952—Judiciary Act—our judicial system. It created a Court of First Instance consisting of the Superior Court and the District Court, and by § 24 of said Act it implemented the constitutional provision of § 11 relating to the removal of judges of "the other courts," providing that if the Supreme Court—after ordering the investigation which it may deem necessary with respect to any charges preferred against any judge of the Court of First Instance—"shall determine that there is cause for further proceedings, it may request the Secretary of Justice or other officer of the Court to prosecute the cause," and the Secretary of Justice also, "of his own motion or by direction of the

Governor, may initiate a prosecution for the removal of a judge and shall then act as prosecutor," providing further that "Prosecution shall be by complaint returnable to the Supreme Court *charging the judge with immoral conduct or neglect of judicial duties*," and the court may, "in its discretion while the proceeding is pending, suspend the judge from performing the duties of his office and receiving his salary." If after giving the parties the opportunity to be heard, together with their witnesses, "the Court shall find the charges, or any part of them, sustained, it *may censure or suspend* the offending judge *or remove him* permanently from his office as it shall determine the most appropriate penalty under the circumstances." (Italics ours.)

The constitutional provision to the effect that "the judges of the other courts may be removed by the Supreme Court for the causes and pursuant to the procedure provided by law," is intended to furnish, by legislative fiat, a method substituting the *impeachment* established in the Constitution for the removal of the Governor, of the Controller, and of the Justices of the Supreme Court, but with the same purpose: the *removal* of the judges of the other courts; and on the one hand, it has the scope of designating this Court as the only forum authorized to remove said judges from their offices and, on the other hand, of establishing the mandate that the causes and method of such removal shall be prescribed by the Legislature.

This provision, however, did not limit the authority of the Legislative Assembly—in the exercise of its inherent full powers—to prescribe, as it did, by § 24 of the Act, other disciplinary sanctions for conduct which, although unbecoming a magistrate, was not of such nature as to call for removal. And even though with respect to the *removal* itself, the constitutional provision works as a limitation to the authority of this Court to expel, by means of disbarment, a judge from his

office [1]—since by virtue of said provision the causes and the procedure for removal should be prescribed by and emanate from legislative action, since the court may not enlarge them at its discretion—neither did it limit, of course, the inherent power of this Court to discipline a member of its own bar, because of his position as judge, for misconduct as such magistrate, which in an attorney would be ground for suspension or censure.

The Legislative Assembly required, among other things, that the judges of the superior or district courts be previously admitted to the bar by the Supreme Court and that they be of moral character—§§ 12 and 17 of the Judiciary Act— 4 L.P.R.A. §§ 92 and 152. Precisely, because to be a judge he must be an attorney, a member of the bar can not find protection in his judicial position from the disciplinary consequence of a conduct which in an attorney would mean suspension or censure.[2] Being aware of this fact, the Legislative Assembly not only did not attempt to limit by § 24 the inherent power of this Court to discipline the members of the bar, but rather it reconciled the purpose of its own statutory provisions by adding to the penalty of *removal* of a judge, that of *suspension* or *censure*, thereby giving this Court the opportunity to exercise, as a milder disciplinary measure against the judges, the power which inherently and as an incident of its own authority, it may exercise to discipline an attorney at law.

The Legislative Assembly did not catalogue as less exacting the ethical values for the office of judge because of his position as such and more exacting for the practicing at-

---

[1] It has been noted that at least in those jurisdictions where the admission to the bar is a qualification to be appointed judge, disbarment automatically entails removal from office. Phillips and McCoy, Conduct of Judges and Lawyers, 146, 147. *Cf. In re Burton*, 246 Pac. 188; *In re Stolen*, 214 N. W. 379; *In re Copland*, 33 N.E.2d 857; *In re Spriggs*, 284 Pac. 521; *In re Craig*, 82 P.2d 442; *Helwig* v. *Payne*, 241 Pac. 884; *State ex rel. Willies* v. *Monfort*, 159 Pac. 889.

[2] See *In re Williams*, 113 S.W.2d 353, 128 S.W.2d 1098.

torney, because he was not such a judge. Although in different spheres, practicing attorneys are a co-substantial part of our judicial system. Without them the judiciary can not survive. When they are not judges they actively assist in the administration of justice. Their representation in criminal actions fulfills the aim of the state to protect the rights of the citizens. When they are judges they perform their work by themselves, with the co-operation of those who are not. It is to the attorneys at law that our Constitution and our Legislature turn to make up the judiciary. The exercise of judicial authority by a judge—who is a judge because he is an attorney—can not relieve him from the fundamental standards of conduct imposed on him by the ethical values of his professional status.[3]

Including the alternatives of *censure* or *suspension* together with *removal* of a judge of the Court of First Instance as penalties for "immoral conduct or neglect of judicial duties," the Legislative Assembly did not limit those alternatives to cases of neglect exclusively. This is clearly manifest from the language of the Act—§ 24—and from its legislative history.[4] The same follows with respect to the scope of the

---

[3] Section 9 of the Act of March 11, 1909, 4 L.P.R.A. § 735, established as a ground for temporary disbarment or suspension the fact that an attorney ". . . is guilty of any deceit, *malpractice*, felony or misdemeanor, in connection with the practice of his profession or who is guilty of any *crime involving moral turpitude* . . ."; providing that when an attorney be convicted "of a felony committed in connection with the practice of his profession or involving moral turpitude shall, upon such conviction, cease to be an attorney . . . or to be competent to practice law as such." (Italics ours.) It has been a well-settled rule of this Court for the last thirty-seven years that our law ". . . does not enumerate all of the causes for disbarment and it is so broad that it covers any imaginable just cause . . . ." *In re Tormes*, 30 P.R.R. 248.

[4] In explaining the scope of § 24 to which we have referred, the report submitted by the committee which drafted the project which culminated in the present Judiciary Act, and which report was attached, *in its original English text*, to its own report, by the Juridical Committee of the House of Representatives in recommending the approval of said bill (B.H.R. 14), states, insofar as pertinent, the following:

". . . Sanctions within the power of the Court to impose are *censure,*

phrase *immoral conduct* as a cause for imposing any of the punishments enumerated.

Although the statute does not define the phrase *immoral conduct*,[5] the scope given thereto—as a cause for removal, suspension or censure—includes not only such conduct as may by itself show such degree of moral turpitude as to render him unfit to act as a judge (*In re Rivera*, 75 P.R.R. 40, 54), but also any conduct which is improper, censurable, unprofessional or wrongful, in connection with his duties as such magistrate, which might bring him in disrepute before the public; without it being necessary that the conduct in such cases be punishable by a disciplinary sanction other than removal, only if it betrays a perverse, corrupt or malicious plan, design or purpose, of a judge, for if this were the case, moral turpitude would be ostensible and the expulsion from his office inevitable. It is impossible to attribute to a Legislative Assembly, consisting almost entirely of almost all the members of the Constitutional Convention which approved our Constitution on February 6, 1952—precisely at the very moment when in the exercise of their constitutional power they are engaged in making a complete reform of our judicial system—the purpose of condoning any conduct of the judicial officers, no matter how improper or reprehensible, which does not call for permanent removal, and of denying to this Court, by

---

*suspension* or *removal* from office, thus clarifying the preexisting law which seemed to be limited to *removal* or *acquittal*.

"Causes for removal or other penalty imposed by the Court on a judge *are immoral conduct* and neglect of judicial duties. The first includes *any taint of immorality* or *wrongdoing* making the judge unfit to act or command public confidence as a judge. The second includes not only absence from court sessions or failure to perform the work of the court but also any failure to follow the high standards of judicial ethics established by professional codes which, it is expected, will be expressly adopted in substance and in spirit, for the courts of Puerto Rico." (Italics ours.) Minutes of the House of Representatives, 1951–52, pp. 400–401; 4 L.P.R.A. at 774.

[5] "The danger of definition has always been an article of faith among jurists." See *The Dictionary of Justice* in Seagle, "Law: The Science of Inefficiency" 16, 23 (1952).

guaranteeing sweeping immunity to such conduct, the disciplinary power which is essential to maintain the respect and dignity of our courts in the highest public esteem.

It seems clear that if the causes prescribed by the Constitution for the *removal* of the Governor, the Controller, and the Justices of the Supreme Court (Art. III, § 21) and for the expulsion of the legislators (Art. III, § 9) are intended as a limitation upon the legislative power delegated by the Constitution to fix causes for the *removal* of the judges of other courts, or as a test to determine the scope of the phrase *immoral conduct* used by the Legislature in the statute,[6] we would have to rewrite § 24 in order to eliminate therefrom neglect as a cause for *removal*, because there is no reason why the freedom of action in judicial functions, as the exercise of political authority, should be protected by different standards in either case.

If public opinion is the product of the ethical values prevailing in our society at the time the Constitution was approved, we should confront the following alternative: either the Constitutional Convention did not regard neglect in the performance of judicial duties as a violation of ethical values, or definitively it only mentioned those the violation of which served as cause for removal, according to the hierarchy of the officers to whom it was applied, within the structure of the political status it created.   In the former case, we would have to conclude that the Legislative Assembly, contrary to tradition and the express delegation of power provided in § 11 of Art. V, could not add other causes than those designated by the people to suspend the Governor, the Controller, the Justices of the Supreme Court and the Legislators, from the exer-

---

[6] To accept this rule of construction we would have to conclude, moreover, that the persons who enacted the law—who were practically the same ones who *approved the Constitution*—were liable of inadvertence in using different terms to regulate the same acts.  Since both legal bodies were object of careful study and serene reflection and both became effective simultaneously, the inescapable conclusion is that the purpose of using different terms was to establish different context.

cise of their authority.  If the latter, we must perforce go to the law and to its legislative background.  In that sense, the Legislative Assembly provided that said conduct as well as neglect, were grounds for removal, suspension or censure.  If, as emphasized in the report of the committee which drafted the Judiciary Act, neglect includes not only the omission to perform the work, but also the failure to follow the high standards of judicial ethics, we could, in the last instance, be dealing with violations characterized differently and within different degrees, but always of ethical context;  but certainly never within the vacuum of the law in order to sanction such conduct which is admittedly highly improper of a magistrate, even though it does not betray moral turpitude.[7]

The ethical concept of the judicial conduct which is inherent in the judiciary, can not be made to depend on the existence or nonexistence of a written code.  If § 24 of the Act in authorizing the suspension or censure of a judge merely referred to the neglect of a magistrate in the performance of his judicial duties, and to this term we should give the ethical content stated above, we do not see how the improper conduct of a judge, merely because it does not show moral turpitude or unfitness, may no longer be characterized as sufficient cause for a penalty not entailing removal, when the conduct has transgressed the ethical sense of such standard.  Little can a judiciary, protected by a cloak of immunity against suspension or censure for improper conduct not showing moral turpitude, advance the honor of its own prestige, if the conduct itself, independently of any characterization applied to it, leaves to the public imagination the measure of the penalty that ought to have been imposed.

---

[7] It is to be noted that Act No. 58 of April 29, 1930, provided as causes for *removal* of the district judges (now superior) the "immoral conduct" besides "prevarication" and "any offense implying *moral turpitude*." (Italics ours.)   We are forced to conclude that the term "immoral conduct" had at that time a broader concept than "prevarication" or "moral turpitude."   Otherwise its use in the Act of 1930 would have been superfluous.

A magistrate who has been convicted of moral delinquency can not return to the judiciary to reassume his duties after having been suspended or censured for acts which do not show moral turpitude but which are "highly improper and injurious to the prestige, dignity, and good name of our courts of justice" and constitute "conduct incompatible with the conduct that should be observed by a man whose mission it is to administer justice." The process is one of fair balance in order to purify the values entrusted to public faith. Because indeed, the judiciary would be more seriously impaired and the confidence placed by the people in our courts of justice would bear more deterioration if any force were given to the belief that conduct of that nature is in any way sanctioned by judicial function and that a magistrate guilty of such conduct could continue to serve as a minister of justice without receiving from this Court the formal penalty warranted by the circumstances.

Since every exercise of power, whether legislative, executive or judicial, represents the exercise of political power delegated by the people, there can be no distinction between the judicial power exercised by this Court when it entertains with original jurisdiction proceedings and actions determined by law, in conformance with § 5 of Art. V of our Constitution, and the judicial power which it exercises in the removal of judges of other courts, pursuant to § 11 of the same Art. V.

In both cases it exercises political power and in both cases it exercises a judicial function. When impeachment proceedings are taken to the Legislative Assembly pursuant to § 21 of Art. III of the Constitution—applicable to Justices of the Supreme Court by virtue of § 11 of Art. V already cited —as well as when this Court entertains proceedings of removal of judges of other courts, the function discharged by each is the exercise of political power. In the former the causes and the proceeding were expressly fixed by the Constitution. In the latter, the Constitution left the determination of the causes and the proceeding to the Legislative As-

sembly, which exercised its authority in the manner described earlier in this opinion.

My opinion as to the power of this Court, pursuant to § 24 of the Judiciary Act, to suspend a judge of first instance from his office for improper conduct not entailing a removal, is not based on a superior degree of power, nor on a division of ranks within the Judicial Power—which is a unified system. (Art. V, § 1 of the Constitution.) Nor is it based on the existence itself of categories of courts, which is an indispensable condition in every organized judicial system. The fact that this Court has the power, derived from the law, to suspend or censure a judge because of improper conduct not entailing his removal, can not constitute a limitation upon the political authority which is represented and exercised by said magistrates—which naturally does not come to them by delegation of the Supreme Court.

The power to create and eliminate courts, with the exception of the Supreme Court, and to determine their jurisdiction and organization, within the proper constitutional limits, devolves on the Legislative Assembly. One thing is the sameness of origin of the judicial power in terms of delegated political power, and another is the specific limitations imposed, in the exercise of such power, by the Constitution and by the law upon the different courts integrating the judicial system. Needless to say one thing is the exercise of judicial power and another the conduct of the judges integrating it. The constitutional guarantees of judicial independence presuppose a dignified, circumspect and discreet exercise of such power. As long as the Judiciary, by its own acts, keeps within the mark of dignity that the public has a right to expect, the judges need feel no fear or anxiety. Anxiety and fear might find their way in the heart of the people, if the protection to the judges in the performance of their duties—which certainly is a part of the guarantees essential to an independent judiciary—should minimize the ethical standards of judicial conduct. Neither the people, through its Constitutional Conven-

tion, nor the Legislative Assembly, through the Judiciary Act, have fettered, much less condone, any transgression of the standards of judicial conduct under the guise of protecting the integrity of the exercise of political power. In no civilized community, and certainly not in ours, does such a scale of values prevail.

## II

I believe that the first charge relating to the incident in the courtroom on Friday, May 3, 1957, was sufficiently established by the evidence.

The respondent, whose duty it was, by his position as presiding judge, to maintain order in the courtroom, controlling his own personal reactions equanimously, violated the solemnity of the courtroom by giving vent to his impetus, and interrupting the session of the court with an abrupt recess to descend in a violent attitude from his very high curule of magistrate to meet the challenge of an attorney. *"I could not let* him [the attorney] tell me that I was taking advantage of that [that I was a judge] *as if I were afraid of him; that is why I adjourned the session and came down to see if he would kill me.* I was carrying nothing" (italics ours) are the very words of the respondent which directly reveal the gravity of his behavior.[8]  (Complainant's Exhibit 15, p. 49.) It constitutes improper conduct of a judge to contribute actively to discredit the dignity and prestige of the courts by

---

[8] The respondent explains his behavior thus: *Exhibit 15 of complaint,* p. 16: ". . . since I know that he wanted to appear before the public as if the officers were afraid of him and I am not yet afraid of anyone, I came down. 'Court adjourned' and I came down from the bench. I was not going to fight with him, someone held me back; people there held us . . ." *Record, p. 1108:* ". . . I decided to take a recess in order to calm my nerves I adjourned and came down." *Record, p. 1109:* ". . . . I was not going to fight. I had in mind going to my office, take an equanyl, calm my nerves and then ask two or three of my colleagues to fetch César Andréu Ribas and ask him to give me an explanation."

*Record, p. 1111:* "I was really angry, but I was not furious or violent; and precisely because I was angry I wanted to get it off my chest, I declared a recess to go to my office and take an equanyl, which I did."

converting the courtroom into an arena for combat and using language unbecoming his culture and position, even though prior to the disturbance of the peace, to the violent attitudes and to utterances which were rude or of bad taste, the court had adjourned—precisely because the judge decided to show his courage in the personal field—or to utter an ephitet within the hearing of those who were present even if it was used as an adjective, in a figurative sense, to qualify the attorney as a coward or pusillanimous individual. The impropriety of such utterance which can not be justified as a matter of semantic, lies in the fact that its use in our society is proscribed by our good customs and usages. The place in which it was uttered and the circumstances under which it was used, independently of the fact that it was an imputation demeaning the personal merits of the attorney, made it an offense against the very dignity of the court. Courtrooms are solemn tribunals where the duty of an attorney, even within the ample freedom of defense to which he is entitled in the serious task of pleading his cause, does not imply that he is free to envelope the personality of the presiding judge in a cloud of unfounded suspicion, nor where the serene attitude of the judge should yield to a moment of anger in detriment to the high dignity which he represents.

Attorneys and judges, more than any other citizen, have the obligation to see that courts are not discredited before the eyes of the public, by observing the proper composure in the course of the judicial proceedings and by avoiding that a cleavage in the personal relations,[9] in itself undesirable, may

---

[9] On April 15, 1953, in rendering the opinion of the court in a case which has no relation to the present one, *Cordero* v. *Rivera*, 74 P.R.R. 548, 570, I did justice to the trial judge therein—respondent herein—when his actions were challenged vehemently by one of the attorneys in that case—who is not the attorney involved in this proceeding—as follows:

"The third assignment is sustained insofar as it charges an error in weighing the evidence but—to do justice to the trial judge—it must be set aside in that part in which the judge is charged with having acted with 'passion, prejudice and partiality.' Said imputation is not justified. Far from it, the trial judge acted prudently and was extremely scrupulous.

lead to the violation of the rule of conduct which the people have a right to expect. Obviously, it is up to the judge, as depositary of the judicial authority, to maintain order and the dignity in his court, not only because of the austerity, circumspection and firmness which his acts on the bench represent, but also because of the coercive use of the power vested in him, if necessary. And if an attorney be guilty of unwarranted attacks against the honesty and integrity of the magistrate,[10] there is always a tribunal where he may be made to answer for such conduct, and the magistrate shall elevate the dignity of his court as well as his own, if being aware of the majesty that clothes him, he restrains his impetus of anger to avoid jeopardizing, in the heat of his indignation as a man, the symbol which he represents as a judge.

---

Precisely so, because said attitude which constitutes a desirable standard of judicial attitude in every case, was in this case imperative, because here, as in other cases in which he acted as counsel, defendant's attorney had moved for disqualification of the judge, on the ground that he was 'a personal irreconcilable enemy' which question had been previously heard and dismissed before a special judge."

And in a separate opinion, in that same case, with a view to mend the personal relations between attorney and judge, I set forth the following concepts which I can very well repeat here:

"I wish to add now, separately from the opinion of the Court, these words: between the nobleness of the chivalrous gentleman that characterizes the attorney . . . —an honorable man of spotless life and unblemished honesty—and the chivalry of the noble gentleman that characterizes Judge Fernando Gallardo Díaz—an upright magistrate, of keen mind and honest conscience—there can be no distance. Men of noble spirit are united in the communion of their lofty souls: the emptiness of a chasm exists only between men of meager spirit. An outstretched hand in time may salvage the distance that should not exist."

[10] At the inauguration of the building to be devoted to the Bayamón courts, Superior as well as District, and upon being called to say some words, I referred to the respondent here as follows:

"I must say that justice is the highest expression of the humanization of the law of which, undoubtedly and unquestionably, an eloquent exponent is the judge who presides this Superior Court, Fernando Gallardo Díaz. If he is guilty of any fault, as we all have, it is the fault of feeling with the full emotion of his soul, the human tragedies that reach the courts of justice in the garb of arid judicial proceedings, where notions peep out, sometimes furtively, because not always can we face such problems in their full latitude. This arid judicial proceeding plays the part of a small

## III

Pursuant to the facts that this Court has deemed proved as to the second charge—which represents the version most favorable to the respondent—his conduct was likewise improper:

1—Because since the letter of May 6, 1957 was evidently intended to deny the information published in the issue of the newspaper El Imparcial of that same day, the respondent, who "was interested in seeing that the false information be corrected," Record, p. 1227, and who therefore was the party favored thereby in its content as well as in its manner of expression, made the letter public in the name of the court,[11] by reading it aloud and reproducing it in the minutes of the court for the purpose of perpetuating it in an official record

window through which one may look out into life. That is, in my opinion, one of the virtues of Fernando Gallardo Díaz. He may be explosive in his soul and in his emotions and at times he may commit errors of law, precisely because he is carried away by the explosion produced in his soul by the great tragedies of life which touch on the problems of the individual in all its basic expression of singleness.

.     .     .     .     .     .     .     .

"I have the conviction that this temple, which today opens its doors to receive the whole mass of problems which flow to the courts in the manner of judicial proceedings, shall be presided by men who are called upon to perform their duty here, a just temple for the loftiest expression of justice which this, our people, need and represent and which it shall broadly proclaim to the four winds so that it be heard, admired, and so that it be followed and envied in its full grandeur of spirit, in its mighty work of justice." (Complainant's Exhibit 15 at pp. 5 and 6.)

[11] The respondent thus explains why he wanted to include in the minutes of the session of Monday, May 6, his statements, from the bench, as to the information appearing in El Imparcial on that same day (Record, p. 1133):

"Q. I want to refer to this here which says that you announced from the bench the following: 'The court wishes to state and make it a part of the minutes, that there appears in the newspaper El Imparcial an information which is a discredit, if it were true, to this court.' Why did you say that from the bench? "A. At that time there were many jurymen, the court was full of jurors. On that same day or on the preceding day a newspaper published the information that I had challenged and caused a scandal. A lie. And I wanted to give the true version to the people that know me in Bayamón, to the jury that works with me, to the citizens of Bayamón."

and clothe it with the solemnity of a judicial act, without making public at that time the origin of said letter and the fact that respondent himself had dictated it—even though at the request of the newspaper reporter—the respondent being aware that the reporter had not been present during the incident of Friday, May 3, without making clear the ambiguous terms of said letter as to this particular, and from which a contrary impression might be easily deduced.

2—Because in reproducing said letter in the minutes of the court of the session of Monday, May 6, he gave perpetuity to an act which, although signed by the newspaper reporter in a postscript added, at his request, by the stenographer Amaral, it was a false fact, the falsity of which was known to the respondent, who permitted said stenographer to so state in the postscript: that it was the reporter who had dictated the letter to said stenographer and that was why the letter was typewritten.[12]

3—Because he used his own tribunal and the solemnity of the judicial sanctum to employ ex parte, and in the absence

---

[12] The incident of the postscript is explained by the respondent as follows: (Record, pp. 1224–25)

"Q. Did he ask that anything else be added?

A. No, he did not.

Q. He asked for nothing else?

A. He asked that a postscript be added. He said 'Counsellor knows that I do not know how to typewrite, please ask Amaral to insert a postscript saying that I dictated it to him.

Q. But you knew that that was not true?

A. I knew that it was not true. And I told him: 'Well, that is your affair.'

Q. You knew that Mr. Santini had not dictated the letter, that you did?

A. Certainly. But that was his own business.

Q. But you were the one who directed the stenographer to add the postscript?

A. I did not direct him, it was Mr. Santini.

Q. But you called the stenographer?

A. I told the stenographer that Mr. Santini wanted to add the postscript. But that was something suggested by Mr. Santini and I warned him: 'That is your business.' But he wanted to do it.

Q. Colleague, you were the judge in Bayamón and you were in the

of the attorney who evidently was involved,[13] language unbecoming a magistrate and which assailed the dignity of the courts, in stating, immediately prior to reading the letter in question, the following:

"We want to make these statements because whoever reads 'El Imparcial' might believe that the presiding judge of this court is a gangster, and I have never been a gangster, nor anything like a gangster, nor have I been a gangster attorney, nor associated with gangsters. On the contrary, I pride myself of having been District Attorney of Guayama and District Attorney of San Juan.

"Of course, the information published in the newspaper, in the manner it appears written, shows that it seems to have been inspired by someone associated with gangsters, because those things are usually the product of that kind of people." *Complainant's Exhibit 14.*

---

office of the judge of the Superior Court of Bayamón and you called the stenographer reporter of the court in order to add a postscript which you knew to be false?

A. Well, it was not my lie. It was his lie.

Q. But you consented . . . .

A. And that was a lie to which I did not have to give any consent, that was something spontaneous of Mr. Santini; it was something of his own mind, of his own action, of his own will that he wanted to include. That is why I told him: 'That is your own business.' "

[13] *Complainant's Exhibit 15,* p. 24:

"At any time after the incident did you go down to the automobile of César Andréu Ribas?

After everything was over, *since I know that he is always accompanied by gangsters and with people whom he had defended for murder* and things like that, I said: 'I am unarmed here now.' *I thought there might be one of those gangsters that go around with him,* several of them; I went down to get my revolver from the dash of my automobile; I did not get to the car, I changed my mind; I went down to the foot of the stairs leading to the municipal court; I decided to let things go as they were; I returned and continued the session." (Italics ours.)

*Record, p. 1196:*

Q. "Why did you think that you should go and get your revolver from the automobile?

A. Well, I thought that *because I know that colleague Andréu Ribas is always accompanied by people who are not very saintly in their bravado.*

Q. Repeat what do you mean by 'people who are not very saintly in their bravado'?

A. Well, people who are . . . *bodyguards as they are called here.*" (Italics ours.)

## IV

Based on the views I have set forth as to the scope of the law and the actions of the respondent, I believed that it was proper to grant the complaint insofar as the charges alleged improper conduct on the part of a judge in the course of and in connection with judicial proceedings, which conduct does not show moral turpitude on the part of the respondent to render him permanently unfit to exercise the duties of his office and to require his removal, but reveals an attitude which is highly improper and belittles and impairs the dignity of his office and which, in my opinion, warranted a suspension for six months, as a disciplinary measure.

Opinion of MR. JUSTICE HERNÁNDEZ MATOS in which MR. JUSTICE SANTANA BECERRA concurs.

San Juan, Puerto Rico, March 12, 1959

The first charge concerns respondent's conduct in the incident of Friday, May 3, 1957, referred to in Findings of Fact Nos. 8, 9, 10, and 11. The Secretary of Justice of Puerto Rico, in his own right and represented by the special prosecuting attorneys at large Aponte and Gil, maintains: That the respondent's conduct in the course of the incident was immoral and unbecoming a magistrate, employing obscene and offensive language, in a loud tone, which gave rise to the consequent disorder and interruption of the proceedings and the intervention of several attorneys and officers in order to avoid physical encounter between him and Andréu Ribas, an attorney at law; that the respondent "injured greatly the prestige, dignity, and good name of our courts of justice." Charge No. 1 and Brief for Complainant, p. 7.

In his defense, the respondent alleges briefly: That in order to justify the censure, suspension, or removal of a judge, a single act is not sufficient ground, that it is necessary to

show a continuity of irregular or illegal acts; that his conduct was justified by the imputation which the attorney made to him; that such conduct was a reasonable mental reaction upon reading the motion "for the first time"; that that motion was the cause of the whole problem; that the attorney challenged him; that the word which he employed outside the courtroom is in bad taste, vulgar, and nothing more, and that it means coward and pusillanimous; that it did not give rise to any disorder; that Andréu Ribas, the principal witness against him, made "26 false allegations" and, therefore, his entire testimony is false, wherefore respondent's conduct can not be characterized as immoral. Brief for Complainant, pp. 5–16.

The course of conduct of the respondent judge (which appears from our Findings of Fact under Nos. 9, 10, and 11) is incompatible with the conduct that should be observed by a man whose mission it is to administer justice. The use of defiant language in the presence of court officers, numerous attorneys, litigants, and a public composed of women and children; the pounding on his desk; his readiness to have in open court a personal encounter with the attorney; the situation created by the disturbance of the order and of the atmosphere of serenity in the judicial proceedings; the spectacle of a judge held back by his arms and being pushed toward the hallway by the marshall and several attorneys in order to avoid a physical encounter between magistrate and attorney; and the suspension, for a long time, of the entire judicial proceedings, constitute without doubt actions which are highly improper and injurious to the prestige, dignity, and good name of our courts of justice.

Under the circumstances of this case, we believe that the excuses offered by the respondent to justify his conduct are not acceptable. The rule that a single irregularity or illegal act, whatever it may be, is always and in every event insufficient ground for the exercise of our disciplinary jurisdiction,

would not be sound and reliable.[1]  In *In re Dávila Reyes*, 79 P.R.R. 768 (1957), the respondent judge was removed permanently for having committed a single illegal act, notwithstanding the fact that he was acquitted by a jury in a criminal action involving the same illegal act.  *Cf.* 48 C.J.S. Judges § 27, p. 976.

Was the judge's conduct justified by the accusation made to him by Andréu Ribas in his motion for amendments to the transcript?  It is true that the serious charge made to him by the attorney in his motion was unjustified.  It is also true that in the course of the hearing the attorney did not offer any excuses or apologies to the aggrieved judge, but merely admitted that the omission had been involuntarily committed by the stenographer, and that the latter was a correct and honest officer.

Yet, the attorney's misconduct on that occasion by failing to give in open court an explanation which would blot out any suspicion that the respondent had intervened in the omission committed by stenographer Amaral, and even his improper behavior in court in addressing himself to the public rather than to the court—R. 899, 900—called for the respondent's composure as a magistrate and to exercise the authority, means, and resources conferred by law and by the inherent power of every court to maintain order, its prestige, and dignity.

If the respondent had some knowledge of the motion before the trial, if he regarded the attorney as his unrelenting

---

[1] The holding in *Pérez* v. *Meraux* (1942), 195 La. 987, 197 So. 693, cited by the respondent, is that, where a single act of a judge, in rendering judgment, is considered an error in judgment, such act is not sufficient ground for his removal.  In his treatise *Comentarios a la Ley de Enjuiciamiento Civil*, Vol. 2, pp. 484, 485 (7th ed.), Manresa classifies into judicial and governmental the misconduct of judges which, according to the Organic Act of the Judicial Power and the Law of Civil Procedure of Spain, may call for disciplinary punishments.  The former refers directly and immediately to matters of procedure, which shall consist of the violation of some precept of procedural law.  The latter refers to the discipline and decorum of the officers and to the good government of the corporation known as court, without direct and immediate relation to the procedure.

enemy, if he knew that "he always carries a pistol on his belt" and that on that occasion he carried "a big revolver," that "he is always in the company of gangsters and people whom he has defended in murder cases and the like," that "he has no respect for the courts," that "on more than one occasion he has offended a judge," that "every time he has had an opportunity he has sought some way of hurting me," and if he believed that "César Andréu Ribas believes that we judges are afraid of him and that those cases will be decided on a man-to-man basis"—R. 401; Exhibit 15 for Complainant, pp. 7, 12, 13, and 17—at that moment the delicate situation could not be handled as unwisely as the respondent did. It was his duty to contain himself within his own sphere of duties as a magistrate, to control his mental reactions which would impel him to convert the sanctum of a court of justice into an arena for a personal encounter.

The word employed by the respondent after he had already entered the small hallway is not obscene in itself. See the definition of 'pendango' in *Vocabulario de Puerto Rico* by Augusto Malaret; the definitions of this word in *Diccionario de la Lengua Española*, 1956 ed.; *Diccionario Vox de Publicaciones Spes*, 2d ed.; *Diccionario Enciclopédico Hispano-Americano;* and *Diccionario Ideológico* by J. Casares. He employed it as an adjective, in a figurative sense, to call the attorney coward or pusillanimous.[2] But the tone of his voice was sufficiently strong and reached all those who remained in the courtroom. At that moment, and even conceding that the respondent used that word so they would let him loose, the utterance became an unwise accusation of cowardice or pusillanimity which gave rise to a reciprocal and like imputation,

---

[2] In his testimony given before the prosecuting attorneys on May 14, 1957, the respondent stated among other things: ". . . and I said that he was a 'pendejo' and I say so everywhere, because I believe that a man who does what he did to me is a 'pendejo'; he was carrying a big revolver knowing that I was unarmed. My revolver was in the dashboard of my car." Exhibit 15 for Complainant, pp. 23 and 24. "The trouble is that César Andréu Ribas turned pale when he saw me coming down. What is more, he insults people and then avoids them." *Id.* at 25.

in open court, on the part of the attorney which could have worked deplorable consequences.

As admitted by the respondent, in Puerto Rico the word is in bad taste and vulgar.  Its use is improper and incorrect among educated people, particularly in or near a court of justice.[3]

Yet, despite the fact that we do not approve of the conduct of the respondent judge in the incident of Friday, May 3, 1957, we believe that, taking into account all the attendant circumstances, his conduct is not the immoral conduct which the law contemplates as being sufficient ground for removal of a magistrate.

"Immoral conduct" has been defined as conduct which is willful, flagrant, or shameless, and which shows moral indifference to the opinions of the respectable members of the community.  *In re Rivera*, 75 P.R.R. 40, 54 (1953).[4]  It must

---

[3] Canon IV of the Canons of Judicial Ethics approved September 24, 1957, reads in its first paragraph:

"A Judge should conduct the work of the Court in an orderly and circumspect manner.  He should be alert to avoid any behavior that might affect the dignity and respect due the Court.  He should prevent improper conduct by attorneys, prosecuting attorneys or other officers of the Court or of any other person in the courtroom.  In the course of the court proceedings, his general attitude, his statements, and his tone of voice should be kept within the proper decorum and circumspection.  In maintaining the dignity and efficient functioning of the Court, a Judge should not display undue impatience or excessive severity."

[4] In *Warkentin* v. *Kleinwachter*, 27 P.2d 160, 163 (1933), decided by the Supreme Court of Oklahoma, it was said:

"The words 'morality' and 'character' may have the same meaning when standing alone, but when used together the word 'moral' defines the kind of character required by the rule.  When so used the word 'moral' is in contradistinction to the word 'immoral.'  With reference to the word as used in the rule, this court in Re Hicks, 163 Okl. 29, 20 P.(2d) 896, 897, said: 'Webster defines immorality as a state or quality of being immoral; vice; wickedness; specif., unchastity; also, an immoral act or practice; a vice.  *"Immoral,"* as defined in the Standard Dictionary, is hostile to welfare of the general public; and Bouvier defines *"immorality"* to be that which is contra bonos mores.  In *Moore* v. *Strickling*, 46 W. Va. 515, 33 S.E. 274, 50 L.R.A. 279, it was held, in substance, that that conduct which is willful, flagrant, or shameless, and which shows a moral indifference to the opinions of the good and respectable members of the community, is immoral conduct."

be of such nature as to render the judge unfit to serve as such and deserve the public confidence.[5]

The use of language in bad taste, the intemperate acts, and minor irregularities in isolated instances have been considered insufficient to impose disciplinary penalties on the judges. *In re Bridges*, 225 N.Y.S. 226 (1927); *In re Snitken*, 146 N.Y.S. 560 (1914). As stated in the dissenting opinion in *In re Hirshfield*, 241 N.Y.S. 601 (1930): "In the very nature of the service [judicial], it cannot be expected that some of those engaged therein will not from time to time make mistakes and show signs of irritability."

When there is continuity, habit, or custom in the use of language in bad taste, offensive, or scandalous, in the voluntary commission of intemperate acts, of serious irregularities in his moral conduct or of such vices as discredit him in the public opinion and jeopardize the integrity of his office, the magistrate betrays moral delinquency which subjects him to the disciplinary jurisdiction which we exercise as a means to command respect and obedience to the judicial order, to preserve discipline, and to insure that everyone duly perform their respective duties.

We can not characterize as immoral conduct requiring the immediate prosecution of the magistrate any isolated, occasional, or sporadic act which bears no ostensible relation to some wicked, corrupt, and immoral purpose or scheme.

It is an evident and fortunate fact that from its original reorganization in 1904 until the present time the Puerto Rican judiciary has been served by judges of firm character and moral integrity. Until 1930, there was no specific statute enumerating the causes and outlining the procedure for the removal of judges. In 54 years only three judges have been disciplined, who were unable to realize the magnitude of their mission or who, if they did, did not have sufficient moral

---

[5] See the pertinent part of the Report of the Committee which designed the bill of the Judiciary Act of 1952, which is transcribed as part of the history of § 232 of Title 4 of L.P.R.A.

strength to live up to it. In the first case, this Court, speaking through Mr. Justice Del Toro said:

"The work of competent, diligent, and moral judges is absolutely necessary in the district courts in order that the judiciary may retain its prestige, inspire confidence, and fulfill its mission, so that it will administer justice to all equally, speedily, and fittingly."

The first law establishing the procedure for the removal of district judges was Act No. 58 of 1930 (Sess. Laws, p. 418). The causes therein enumerated for removal were: prevarication, bribery, immoral conduct, any offense implying moral turpitude, inexcusable negligence, or manifest incompetence to perform his duties. The Organic Act of the Judiciary of Puerto Rico, approved May 15, 1950, adopted the same causes and the same procedure for the removal of judges. Obviously it was essential that such immoral conduct as well as other causes therein enumerated be of a serious nature.

When our judicial system was finally reorganized by Act No. 11 of July 24, 1952, § 24 thereof implemented the provision contained in § 11 of Art. V of our Constitution, relative to the removal of superior, district, and peace judges. The causes for removal enumerated therein were immoral conduct or neglect of their official duties. It is evident that within the phrase "immoral conduct" is included the commission of any felony or any offense implying moral turpitude —cf. In re Abella, 67 P.R.R. 211, 220 (1947)—as well as any kind of immoral conduct which, even if it is not classed as a public offense, is "willful, flagrant, or shameless, and which shows moral indifference to the opinions of the respectable members of the community."[6]

---

[6] Although the constitutional provision clearly refers to the *removal* of judges, the Legislature also empowered this Supreme Court to censure or suspend judges. Under pre-existing legislation, the final verdict was confined to removal or acquittal. If acquitted, the judge continued in his office as if he had never been prosecuted. If found guilty, only his removal was

Returning to the case at bar, we realize that the respondent's conduct during the incident did not render him unfit to continue acting as a judge during the rest of the morning of May 3. Shortly after the incident he recovered his tranquility, his composure, his sense of equanimity, and proceeded with the judicial business of the court within proper order and composure, holding the hearings of the other 40 cases set on the calendar for that day. His original personal disposition toward the incident was not to give it any publicity, or to mention it outside of court. Finding 14 and Víctor Manuel Padilla's testimony. R. 679.

The independence or freedom of action and opinion of the judge, his stability in the judiciary, the assurance that his compensation will not be diminished, the respect and consideration due him, have not been established or recognized for his personal benefit. They are essential factors to attract to the bench good and competent men, to safeguard the constitutional guarantees, limitations, and principles, and for the equal administration of justice for all. The judge should feel free of fear of being disciplined for slight involuntary wrongdoings and irregularities committed in good faith, and free also from any kind of pressure which might corrupt his conscience and induce him to commit injustices.[7]

---

in order and he ceased to be part of the Judiciary. Under the present system there may arise an anomalous situation where the presiding judge has been found to be a moral delinquent, but has only been punished by censure or a short suspension. The question whether the Legislature was vested by the Constitution with power to prescribe other penalties in addition to removal, is not before us.

[7] Canon XI of the Canons of Judicial Ethics provides:

"A judge should not only be impartial but his conduct must exclude any possible inference that he is susceptible of acting on the basis of political or partisan influence, or of being influenced by public clamor, considerations of personal popularity or notoriety, or any other improper considerations. He should always be mindful that his only goal should be to administer justice, according to law, with absolute equanimity, and regardless of recognition of his work or of unjust criticism."

## II

The second charge for immoral conduct concerns the letter of Monday, May 6, signed by Armando Santini, which is transcribed in footnote 5 of the Findings of Fact of this Court. It charges that respondent in drafting the letter knowingly caused several false statements to appear therein, to wit:

1. That Santini was present in Bayamón and in the aforementioned incident;

2. That Santini had read the transcript of the stenographic record of that incident; and

3. That Santini had dictated the letter in question.

He was also charged with making verbally in open court, on the same day, the false statement that the letter in question had been written by Armando Santini himself.

In the letter which the respondent dictated at the request of reporter Santini Berríos, regarding the incident of Friday, May 3, it is stated in part:

"During the incident to which that information refers, there was no other newspaper reporter in Bayamón but myself, and I immediately telephoned editor Barbosa Aquino and gave him all the details on the matter."

Nowhere in that sentence is it categorically asserted that Santini witnessed the incident. Its wording, however, lends itself, after considering it separately and apart from the rest of the content of the letter, to the interpretation that Santini witnessed the incident. What that sentence actually says is that on the day of the incident the only newspaper reporter in Bayamón was Santini Berríos, and that he was the first one to transmit the information to Barbosa Aquino. This interpretation is confirmed by the assertion made by the writer in other parts of the letter that other persons who witnessed the incident called him a liar, and that the information transmitted is based on the accounts given "by the prosecuting attorney" and "according" to the judge's report. In

that same letter the following reference is made to the steno-graphic record of the incident: "I have read the record taken by the stenographer on the spot and I am going to copy it, for your information, as follows . . . ." Considering as a whole the content of the letter, we can not conclude that Santini asserts therein that he witnessed the incident, or that the respondent, upon dictating the same, intended to state in that letter that Santini witnessed the incident. Could the respondent have any interest in including that false assertion in the text of that letter, which can be easily contradicted by more than 30 attorneys, several judicial officers, litigants, and other persons who were present at the incident? We believe not.

We quote from the testimony given by him on May 14, 1957, before the prosecuting attorney:

"Your Honor, do you know Armando Santini, reporter of El Imparcial in Bayamón?

"I do.

"Was Armando Santini present in court the day of the incident?

"Witness: He was not present. He arrived later. I do not know the time. That's what I am trying to drive at.

"District Attorney: Please, tell us everything about that matter, about Armando Santini.

"He came to my office and said this to me: 'I was out; when I arrived I was told that César Andréu Ribas challenged you and they have given me the details. Did César Andréu insult you in court? I want you to give me your account, what you know, in order to inform El Imparcial.' I said: 'Never mind.' That happened in my own office. 'I do not want to make any statement or to say anything.' He says: 'Look here, Judge, the trouble is that shortly he will be saying something else.' I said: 'Look here, what they told you downstairs is the truth.' 'May I use your telephone to call up El Imparcial?' 'Certainly.' He called El Imparcial on my telephone. He gave someone, who he told me later was Barbosa Aquino, the version which he had obtained from the public which was there and from District Attorney Grajales and myself. Then he left. I did not see him

.again. Next day the following appeared in El Imparcial in big headlines, more or less saying: 'Bayamón judge causes scandal in court.'

"Or causes scandal in court and challenges attorney?

"Something like that. I read it about eight o'clock. I called Santini at his home; he was not in; his wife said to me: 'He is in the district attorney's office where they are investigating a death.' I called him at the district attorney's office and he said to me: 'Judge, I was going to call you just now. Don't you think that Barbosa Aquino is a scoundrel? He has twisted the facts. Tomorrow I am going to write a letter to Don Antonio and tell him what Barbosa Aquino has done because he was not there, .and I did it because, even though I was not there, when I arrived I obtained the news from the public, from the account of the people and you, and they have twisted everything around.' He then told me this: 'Look here, sir, I am going to ask you a favor; since I can not type, will you please draw up a letter for me. Everybody is calling me a liar, 'what a liar you are, Santini'; you draw up the letter for me and in the morning, as soon as I sign it, I'll take it right away to Don Antonio, because I want to write the letter to Don Antonio. This is not the first time Barbosa Aquino does this to me; he twists the information.' Then in the morning I was the first one to arrive; I am always the first one and I went early. Juan Amaral had drafted the letter which Armando Santini asked me to draw up; Santini arrived later. He came to my office and asked me for the letter; I showed it to him; I gave it to him. He said: 'This is all right, but I would have made it harsher because Don Antonio ought to discharge Barbosa Aquino because he is a liar and people now think I am the liar. But, Judge, something is wrong here, that I wanted to appear as dictating the letter. Please call Juan Amaral and ask him to add a postscript, a postscript to this, to the effect that I dictated it to the stenographer.' That I was kind .enough to call Amaral and I said to him: 'Look here, Juan, please .add a postscript saying that I dictated this letter to you.' He signed it and said to me: 'I am leaving with Fonfrías who is there.' And I said: 'Don't go, please sign the copy of the letter, I want to keep a copy of the letter,' and he signed the copy. I .can show it to you. Here it is. Signed by Armando Santini. You can have it provided you don't lose it. I then went into the .courtroom and Armando Santini . . . .

"District Attorney:

(The letter is returned to him.)

"Then I went into the courtroom. I was ashamed because a newspaper had said that I had caused a scandal in court. The jury was there and the courtroom was full of people. He said this: Armando Santini was there; I said this: 'Attorneys— among them Senator Fonfrías—gentlemen, you probably read in a Puerto Rican newspaper that yesterday I caused a scandal in this court. In order to show you the truthfulness of that information, I am going to read the letter, a copy of which was handed to me by Armando Santini, reporter of El Imparcial in Bayamón.' Santini was there and I read this letter to the public. After the court adjourned, Armando Santini left with Fonfrías in order to deliver the letter to Don Antonio, to Don Antonio Ayuso . . . ." (Exh. 15 for Complainant, pp .29–33.)

Did Santini read "the record taken by the stenographer," according to the letter?

None of the witnesses testified that Santini read the transcript prepared by stenographer Amaral on the incident of Friday, May 3, at the lunch given the next day by the attorneys of Bayamón. Yet, some of them, among them District Attorney Grajales and Archilla Laugier, said that Tomás de Jesús Castro read aloud the complete transcript during the lunch, that they mentioned and commented the incident in the presence of Santini. R. 343, 502, 985. De Jesús Castro testified that after he read the record aloud Santini, who was seated on his left, took it and "scanned it." R. 986. Santini himself testified that De Jesús Castro, who was nearby, read the record of "the ocurrence of Friday the 3d." R. 685. The respondent judge was present when the transcript was being read aloud. R. 1120.

The evidence showed, as a question of fact, that when the respondent dictated the letter, Santini had knowledge of the content of the transcript. If the latter had it in his hands and looked it over, and if during the telephone conversation with the respondent on Sunday evening, May 5, he asked the latter to include in the letter "the recent statements which

appeared in the papers which had been read in the market place"—R. 1122—and, if after reading the letter—which his paper refused to publish—he found it correct and in conformance with his wishes that certain incorrect information be corrected by his paper, and even said that "it was not harsh enough—R. 1124—we can not agree that it was the respondent judge who, of his own initiative and volition, "caused to appear therein" the questionable assertion that Santini had read the transcript.[8]

Did respondent make it appear in the letter that Santini had dictated it?   We believe not.

It is in the postscript of the letter where Santini informs his boss that the "letter *is typewritten* because Mr. Amaral, the stenographer, has been kind enough to do it for me, *exactly as I dictated it to him.*"

After a thorough analysis of the evidence introduced concerning the drafting of the letter, we stated in the preceding Finding of Fact No. 17 that Santini, after signing it, requested that the postscript in question be added to it.   The part of stenographer Amaral's testimony touching on this point, which is taken from pp. 784–86 of the record, reads as follows:

"Q. After you handed the letter and the envelope to Judge Gallardo, what did you do?

"A. I recall that later, before 9 o'clock, about 10 or 15 minutes later, I was called from the judge's office.   I then went to the honorable judge's office and Armando Santini, Ana Delia

---

[8] We believe that the following comment made by the attorney for the respondent at p. 27 of his brief is appropriate:

"Santini himself admitted in his testimony before this Court that on that occasion he was in the market place, and that the record was read there, but he did not pay attention to it.   It is strange and unbelievable that a newspaper reporter should not pay attention to the content of the record of an incident which was the latest news in Bayamón and which Santini himself had been investigating and had reported the previous day to El Imparcial.   Such indifference, such lack of interest, is unheard of even on the part of the most incompetent reporter."

Torres, and the honorable judge were there. The honorable judge told me that Santini wanted to add a postscript to the letter, and Santini told me that the postscript was to the effect that he had dictated the letter to me and that I had typed it for him. Then I took down in shorthand Armando Santini's suggestion, took the original and the copies and returned to my office, typed the postscript, and then returned and gave it to him.

"Q. Before you went to Judge Gallardo's office, did you see Santini. A. I do not recall seeing him.

"Q. Do you remember seeing him before? A. No.

"Q. You say that when you went into Judge Gallardo's office before 9 a. m., Judge Gallardo and Santini were there and Mrs. . . . . A. Ana Delia Torres, Judge Gallardo's secretary.

"Q. Was it Santini or Judge Gallardo who dictated the postscript to you? A. No, sir, Judge Gallardo said that Santini wanted to add a postscript to the letter.

"Q. Then Judge Gallardo told you in Santini's and Montañez's presence . . . . A. Yes, sir. And then Santini told me that he wanted me to state in the letter that he had dictated the letter to me and I had typed it.

". . . . . . . .

"Q. Did Santini himself dictate the postscript he wanted to add? A. No, sir, I wrote down in shorthand what Santini had in mind and gave it shape.

"Q. You gave shape to the postscript?

"A. Exactly.

"Q. Why did you not take down in shorthand what Santini dictated to you. A. I did not do it because on other occasions I had drawn up information for Santini to be published in El Imparcial, but he would say to me: 'Write this down' and I wrote it.

"Q. Did Santini dictate to you on other occasions the text of the informations? A. If not, I did it myself.

"Q. Did you give it shape? A. Yes.

"Q. In that same way, on that day you gave shape to the postscript? A. Exactly.

"Q. So, the postscript which you drew up at Santini's request is not a true and correct transcript of the shorthand notes which you took down at that moment? A. No, sir, it expressed the thought which he wanted to convey."

It is true that after Santini signed the letter the respondent, who had dictated it at the former's request, in open court and in Santini's presence, said among other things:

"But, for the court's satisfaction, the reporter of Bayamón himself has today written a letter to the editor of the newspaper . . . ."

The respondent did not deny, either when he testified before the district attorneys or before this Court, that he dictated that letter to stenographer Amaral, except for the postscript. He admitted at all times that he dictated it, but he explained that he did so in order to carry out Santini's wishes that certain erroneous information be corrected and that he gave form and written expression to the wishes of the reporter, who had even asked him to include in the letter the transcript of the evidence bearing on the incident. Obviously, Santini wanted to get in touch, in writing, with the editor of his newspaper, and, as on other occasions, he resorted to an officer of the court. Santini's participation in the drafting of that letter, including the postscript, can not be denied. If he urged the respondent to dictate it; if he read it in the judge's office and was satisfied with its content, although he regretted that it was not "harsher" and then signed it; if he asked the stenographer to add "a postscript saying that I dictated that letter to you"; if he calmly heard the judge read the letter and took it to the editor of his newspaper for publication, it was not wholly incorrect for the respondent to inform in open court that Santini had written the letter. It is clear that the respondent should have described with greater clarity the origin and circumstances of the letter.

Irrespective of the characterization of these procedures, it has been held time and again that the procedures fixed by the constitution or statutes must be strictly complied with; that the respondent enjoys therein the general presumptions of law; that the complainant has the burden of proof, which must be sufficient, clear, and convincing. *Pérez* v. *Meraux*, 201 La. 498, 9 So.2d 662; *McMillen et al.* v. *Diehl*, 128 Ohio

St. 212, 190 N. E. 567, 568; *State ex rel. Brickell* v. *Hasty,* 184 Ala. 121, 50 L.R.A. (N.S.) 553, 560; *Kane* v. *Rudich,* 10 N.Y.S.2d 929, 256 App. Div. 586; *Stanley* v. *Jones,* 9 So.2d 678, 201 La. 549; 30 Am. Jur. *Judges,* §§ 24–25; 48 C.J.S. *Judges,* § 27.

Although the conduct observed by the respondent judge during the incident of May 3, 1957 is not condoned by us, nor do we approve the manner in which he addressed himself to the persons who were present in court on Monday morning, May 6, yet complainant's evidence has not convinced us that the respondent judge is guilty of immoral conduct. For these reasons, it was my opinion that the complaint should have been dismissed in its entirety and the respondent judge, Fernando Gallardo Díaz, exonerated from the charges preferred against him.

---

Opinion of MR. JUSTICE SANTANA BECERRA in which MR. JUSTICE HERNÁNDEZ MATOS concurs.

San Juan, Puerto Rico, March 12, 1959

I concur in the conclusions set forth by Mr. Justice Hernández Matos in his opinion. I believe that the facts proved do not warrant nor support a conviction for *immoral conduct* within the meaning, extent, and content which I attribute to that concept for the purposes of the removal of a magistrate of the Court of First Instance, which is, in my opinion, the *sole purpose* that may and should be pursued by a conviction for immoral conduct under § 24 of the Judiciary Act of the Commonwealth of Puerto Rico. Although I am in full agreement with Mr. Justice Hernández Matos, I wish to set forth other considerations, perhaps very personal, which lead me to reaffirm his conclusions and my concurrence.

In view of the facts proved in this case, there arises a conflict of two social values of utmost importance which transcend the limits of this or any other particular case. One involves the magistracy as respects the integrity of the admin-

istration of justice; the other, as respects the political integrity of the judicial function. Between both values there is a sensitive balance that should be closely watched, lest one of them should hurt the other.

The exercise of that part of the single and indivisible sovereignty of the people of Puerto Rico inhering in the judicial function was delegated to the Supreme Court and to the other courts created by law.[1] The Court of First Instance was created by law and, hence, its judges exercise that part of the sovereignty of the people which deals with the judicial function on an equal footing of political power with the Supreme Court, since it should not be understood that the superior hierarchy of the Supreme Court, which is a common thing in the structure of judicial systems such as ours, nor its power, in other jurisdictions, of supervision or vigilance over the courts of lower hierarchy, will represent a limitation of the political function of sovereignty incarnated in and exercised by the magistrates of first instance; or that such political function of sovereignty reaches them through hierarchical channels or by delegation of the Supreme Court.

Because it was the people who delegated to the magistrates the exercise of that function of their sovereignty, the appointment of the judges called upon to exercise the public duty entrusted to them, the stability and enjoyment of such tenure as well as the cessation of the office for reasons other than its natural expiration, have been of vital interest and a source of concern to the people itself, for the protection of the delegated power.[2] As regards the latter, the causes fixed for the removal of a Justice of the Supreme Court, that is, what the people considered should be the causes for depriving the

---

[1] Constitution, Art. I, §§ 1 and 2; Art. V, § 1.

[2] Constitution, Art. V, § 8—constitutional minimum term of tenure; § 10—retirement of judges by special law; § 12—protection of tenure against political activities; § 13—protection against termination of tenure by indirect means; Art. IX, § 3—protection of tenure against constitutional age limit.

justice of the exercise of the judicial function of sovereignty vested in him, are treason, bribery, other felonies, and misdemeanors involving moral turpitude. Regarding the removal of judges of the other courts, the people expressly delegated to the Legislative Power the power to establish the causes therefor;[3] and § 24 of the Judiciary Act—Act No. 11 of July 24, 1952—provided that the Judges of the Court of First Instance must be charged with immoral conduct or neglect of judicial duties, and, if the charges are found proved, the Supreme Court may censure, suspend, or remove them permanently from office.

The term "immoral conduct" is in itself a general and all-embracing term. The definitions of this term, whether of a purely legal order or social order, comprise many other generalizations. There does exist a definite concept, many times perceived or drawn by intuition rather than the defined concept, of what is meant by immoral conduct, which is determined by the ethical values prevailing in a society or in a civilization. But sometimes such general meaning does not help in the solution of concrete problems.

Hence, in the absence of a more precise legislative rule as to what acts or what kind of actions of the magistrates of the Court of First Instance will warrant their deprivation of the political function of sovereignty with which they are invested, it seems more appropriate, in the face of the problem involving the removal of a judge and in ascribing meaning and content to the imprecise term of "immoral conduct," if the Supreme Court would look to the intent of the people and fix such conduct, or a similar one, as that which the people deemed fit to fix for the deprivation of the exercise of equal function of the sovereignty vested in a Justice of the Supreme Court. If deemed convenient, there could also be adopted as orientation such conduct, or a similar one, as the Legislative Power itself established in the past as cause for the removal

---

[3] Constitution, Art. V, § 11; Art. III, § 21.

of magistrates of the Superior Court, then District Judges.[4] In either case there would be elements of moral turpitude or moral deformation.

And it seems fitting that, after all, it ought to be so because even though there exist functional hierarchies within the magistracy, in the purity of its symbol and in the public concept of esteem and respect which it should deserve, there is no room for ethical hierarchies in the magistracy. Different scales of moral values are not in order, since in any hierarchical plane in which a magistrate by his acts becomes unworthy of the honor and confidence entrusted to him, he offends equally the society and equally defrauds public values of significant worth entrusted to him.

The foregoing considerations on the interpretative rule which in my opinion should be adopted under § 24—inspired essentially and fundamentally on the immovability and stability of the judges in their offices, which is a basic postulate, not only of the independence of the judicial function as a governmental body against other governmental bodies, but also of the judicial independence in the freedom of the mind and conscience of the judge—explain why I believe that the facts proved against the respondent Judge Fernando Gallardo Díaz do not constitute immoral conduct, for lack of depravation therein. They are facts which Mr. Justice Hernández Matos has characterized in a manner that I need not repeat here, but which arose suddenly from an incident not anticipated by the judge; they are facts which lack malice, insofar as malice is an element of a scheme or plan conceived or carried out with tortuous intention and insofar as there is no malice in the sudden reaction. The judges, unless made

---

[4] Act No. 58 of April 29, 1930 (Sess. Laws, p. 418), provided for the removal of District Judges (Superior) on the following grounds: prevarication, bribery, immoral conduct, any offense implying moral turpitude, inexcusable negligence, or manifest incompetence to perform their duties. The Organic Act of the Judiciary—Act No. 432 of May 15, 1950 (Sess. Laws, p. 1126)—prescribed identical causes for removal. None of those laws provided for other punishment except removal.

of separate clay, are not immune to the weakness and feebleness of the human mind, which is at times carried off and gives vent to passion.[5]

Regarding the incident three days later, Monday, May 6, 1957, alleged as ground for the second charge, I am fully convinced from the evidence that the judge did not coerce or intimidate or induce the newspaper reporter to rectify the information published, nor did he utter any untruth or commit any malicious or wicked act. If he committed any wrongdoing, unbecoming a judge as such but justifiable in the light of the circumstances of the moment, it was to lend his cooperation to that reporter and then spread the rectification upon the minutes of the court together with harsh comments.

They are facts which, I submit, clash with the prevailing rules of the good character and the proper conduct of a magistrate in or outside of a courtroom, and which have thereafter been embodied in a code of judicial ethics adopted subsequent to this case, but the facts are such that, because of their failure to show malice, mental turpitude or deformation, it would be dangerous to consider them as constituting immoral conduct justifying the removal of a magistrate, as affecting the public and constitutional order which I have pointed out. I have referred only to the removal, but not through inadvertence.

To consider as immoral conduct under § 24 the conduct of a magistrate who merely does not live up to the best judicial tradition or to the rules known as canons of ethics, could easily disturb the balance of the two public values referred to earlier in this opinion and thus upset the desired equilibrium between them. It could be argued, on the contrary, that a conviction for immoral conduct under this sec-

---

[5] God grant—recalling a speech delivered by Hon. Samuel R. Quiñones, President of the Senate, at the opening of the past Judicial Conference—that modern technique may never succeed in producing artifacts for imparting justice, perhaps very perfect but lacking human sentiment with all its virtues and weaknesses.

tion does not necessarily imply the removal of the magistrate, in view of the fact that he could be temporarily suspended and even censured and that, therefore, any misconduct would be sufficient. I do not share this view for the following considerations resulting from profound conviction:

*First*, the conviction of a magistrate for immoral conduct and the fact that he continues to impart justice after a period of suspension as punishment or censure, are irreconciliable in my opinion. The term "immoral conduct," regardless of its nature under § 24, has ordinarily in the public concept a connotation of vileness, vice, or wickedness, at least, of impurity. The disrepute with which the judiciary of a country and the public values in general are tainted whenever a magistrate is convicted for immoral conduct is not aggravated or lessened by the greater or lesser degree of punishment imposed on a delinquent judge. The conviction in itself is enough. There are values, such as chastity, which can not be restored once they are lost, and one of them is the attribute of purity of soul which those whose privilege it is to impart justice among his fellow creatures should possess, and if true justice is to be done, it should come from suitable hands and minds which have not once lost such attribute. Thus, I believe, as stated earlier in this opinion, that the *only purpose* of a conviction for immoral conduct under § 24 is and should properly be the removal of the convicted magistrate. Had I been convinced in this case, or in any other case, that the judge has been guilty of immoral conduct, once convicted, I would vote for absolute removal because I believe that the entire magistracy would suffer by his reinstatement after a temporary suspension, with his robe so tainted.

The Report of the Committee which designed the Judiciary Act supports, in my opinion, my view of § 24. According to that Report, the causes for removal or for other punishments to be imposed on a judge are immoral conduct and neglect in

his official duties. It says that immoral conduct includes any indicium of immorality or prevarication which *unfits* the judge to serve as such and to deserve the public confidence; and that the negligence in the judicial duties consists not only of the failure to perform the work *but also the failure to abide by the high standards of judicial ethics established by professional codes*, which *it was expected would be expressly adopted for the courts* of the Commonwealth of Puerto Rico. The commentary could not, in my judgment, be clearer. Immoral conduct: any indicium of immorality or prevarication which *unfits* the judge to deserve the public confidence. This does not imply the notion that the unfitness be temporary, particularly since the unfitness is *to serve* as judge and *to deserve* the *public confidence*. Negligence in the judicial duties: failure to perform the work, but also the failure to abide by the *high* standards of *judicial ethics*, referring undoubtedly to the codes of judicial ethics in force in other jurisdictions and which at that time had not been adopted in Puerto Rico. Hence, it follows that, although it may not be so clearly stated in the wording of § 24, in referring to suspensions or censures it did not contemplate such cases of immoral conduct as would produce, according to the Report, the *unfitness* of the judge as *such;* and it likewise follows that misconduct, in the light of the canons of judicial ethics, which was the only thing proved in this case, would call at the most for charges of negligence.

*Second,* because since under a charge of "immoral conduct" it would be permissible to impose the punishment of temporary suspension or censure if § 24 were construed differently from what I suggest, I do not believe in the virtue of discoloring the term to include any judicial behavior which is merely unwise, intemperant, or improper which might be embodied in such charge. It could happen eventually that the judges of first instance would be subjected actually and effectively, as respects their tenure and the discharge of the

office, to a disciplinary power *inherent* in the Supreme Court which, for obvious reasons and because of the great difference in the origin of the function, should be confined to the practicing attorneys. The eventuality gains more weight if we consider that it is for the Supreme Court to determine, upon the facts presented, whether or not further proceedings should be had; and if a majority of the Court should be of the opinion that any misbehavior or misconduct of a judge is sufficient immoral conduct for the purposes of § 24, there is no question that further proceedings will often be had.

For various considerations I do not believe that such a situation is sound. In the long run, it would tend to belittle the prestige and the high esteem which judges should deserve from the community, which esteem becomes more necessary the more directly one is in contact with it and which in our traditional medium they have always justly deserved. Notwithstanding the absence of a judicial career with the resulting immovability; that the appointments to the magistracy of a hierarchy lower than that of the Supreme Court have not been for life; and that the compensation of judges has not been the most desirable, our magistracy has earned a reputation for honesty free from bribery, prevarication, and venality. José Castán Tobeñas comments that if the prestige of English justice is unquestionable, and that if the standards of Great Britain are very high as respects the independence and integrity of the judges, it is due, rather than to constitutional reasons or of judicial organization, to a set of fortunate, historical, and social circumstances, and that it is the *Medium* and the *social environment* in particular what has insured the independence and the reputation of the judiciary.[6] And per-

---

[6] *Judicial Power and Judicial Independence*, address read by Mr. José Castán at the inauguration of the Courts in 1951. Castán cites, in passing, Manuel de la Plaza, an authority on procedural law, who points out, among the reasons for the success of the English judicial system, "the high esteem which in the *social environment* is attached to the judge's mission, which holds in check the eventuality, very remote, on the other hand, of interference with his functions; the suppression of promotion made possible by

haps these other statements of Mr. Justice Frankfurter are also in point:

". . . The conception of a government by laws dominated the thoughts of those who founded this Nation and designed its Constitution, although they knew as well as the belittlers of the conception that laws have to be made, interpreted and enforced by men. To that end, they set apart a body of men, who were to be the depositories of law, who by their disciplined training and character and by withdrawal from the usual temptations of private interest may reasonably be expected to be 'as free, impartial, and independent as the lot of humanity will admit.' So strongly were the framers of the Constitution bent on securing a reign of law that they endowed the judicial office with extraordinary safeguards and prestige . . . ."[7]

The higher and more worthy the esteem accorded by society to its judges, the greater their shield and the less incursions shall be attempted against the integrity of their office. I honestly believe that a system in which magistrates are, or are likely to be, the object of frequent disciplinary punishments, will not help any in holding them in the high esteem and prestige accorded by society and which is so necessary, even more than the perfect organization of the English system, as observed by Castán, for the adequate function of justice.

There is also at least one other consideration which makes me reflect deeply upon the foregoing statements. I do not know whether the people really had in mind to subject the magistrates to periodical suspensions or punishments other than removal in justified cases. I am not thinking now about a problem of *power* of the Legislative Assembly to authorize

the meager compensation . . . the difficulties encountered in the *removal* of the judges . . . . It all shows that the exalted merits of British justice are not derived from the system of appointment, which can not be frankly rejectable for many reasons, *but from the national conception of justice as a function.*" (Italics ours.)

[7] *United States* v. *Mine Workers*, 330 U. S. 258, 308.

punishments other than the removal of judges. I have in mind a problem of desirability, because the people might well have not considered it desirable, and perhaps, they had reasons for so doing.[8] When the Constitutional Convention met, the legislative tradition was that of Act No. 58 of 1930 for Superior Judges, which again appears in the Organic Act of the Judiciary of 1950 (footnote 4 *ante*). For the then Municipal Judges, now District Judges, there was no provision of law, but it is known that they could not be removed except for just cause; nor did there exist the temporary suspension from office as a punishment. A system which operated in such a fashion for half a century or more must have survived for some reason because, aside from the moral effect in the community to which I have referred above, of judges who have been punished or publicly censured, insofar as it reflects on their delicate function of imparting justice and insofar as they symbolize the judicial authority, in a balance of consequences the suspension of a magistrate from office—I presume that he can not resign during the term of suspension—might well prompt him, in a struggle for existence, to perform acts, not necessarily reviling, but which in some way would harm his reputation and injure the dignity of his office as much as or even more than those for which he was punished.

I do not mean to say that the magistrates of first instance have license to descend to any level of prestige. On the contrary, in such magistracy, as in any other magistracy, there should prevail a perpetual sense of excellence and enlargement of his moral and intellectual values, but it is preferable that it should be so by exaltation of the spirit and by full consciousness of the high prerogative which it performs—justice—which, in the words of William McAdoo, is the brightest jewel

---

[8] Constitution, Art. V, § 11, provides for removal only.

in the crown of democracy;[9] and not because it be afraid to suffer such punishments and discipline as, rather than exalt it, will in the long run impair it in the public opinion. Judges are not devoid of responsibility. Nothing is so true now as it was 87 years ago, when Eugenio Montero Ríos, Minister of Justice and Ecclesiastical Affairs, addressing the Spanish judges on the occasion of the inauguration of the courts on September 16, 1872, in announcing their immovability sanctioned in the Organic Act of the Judicial Power of September 15, 1870, authorized by the Constitutional Courts, said:

"You are, therefore, a power in the Constitution of the State. You are also a great force in the social life. As a public power, you are the guarantee of all the rights. As a social force, you impart efficacy to all the duties. As a power, you are entrusted with the integrity of the Constitution and of the laws. As a social force, you are responsible to the public conscience for the moral state of the Nation . . . . But justice must be elevated to the category of the public powers by the vigorous organization of the institutions charged with its administration, *and by the prerogatives and guarantees conferred to the magistrates who represent them for the meritorious discharge of their functions* . . . . Today, hence, with greater reason than on September 15, 1870, I can therefore say to you: you are immovable. But mind you: *you are immovable from your office because you are responsible for your acts* . . . . The law has endowed you with everything which you have a right to demand. It is your duty to preserve it . . . . The immovability without the conditions which limit it would be the impunity of the betraying magistrate; and our times, as you know well, are not as a general rule favorable to the inviolability of the human powers nor to the impunity of those who transgress in its name . . . . Therefore, if you wish to preserve the immovability, *watch yourself incessantly and see that your judicial duties are performed* in anticipation of the citizen, who may exercise the popular right vested in him

---

[9] Senator William G. McAdoo in the impeachment proceeding of federal judge Halsted L. Ritter, cited by Yankwich in *Impeachment of Civil Officers, etc.,* 26 Geo. L. J. 849, 859. The compilation of impeachments of judges made by the author and the charges against them, beginning with that of Lord Chancellor Sir Francis Bacon in 1620, is interesting.

by the Constitution . . . . Never confuse the sanctity of justice with the inviolability of your acts, for it would work great danger to attempt to shroud the wrongdoings of man in the sanctity of the institution." (Italics ours.)

This is an eloquent statement of principles for a magistracy and, above all, the fact, never to be overlooked by the judges, that they are acting under the sanction of the community which is always present, at times more critical and severe than any hierarchical discipline, which is voiced in the press, in the public opinion in general, and in the other political bodies of the State.

By accident, this Court has not handed down a decision in this case. Because I believe, however, that the foregoing considerations, which are the product of a firm conviction, go beyond the boundaries of the case before us and are common to all others of like nature which may arise, and because of the problem of public right involved, I do not wish to bring this opinion to a close without expressing my personal views as to the desirability of reviewing § 24 of the present Judiciary Act in order that the Legislative Power, as the most direct representation of the people which invested the judges with the judicial power, should determine the particular acts or kinds of acts of a magistrate of first instance which may warrant the privation of his investiture; as well as such other conduct, in the event it is deemed advisable, as would warrant the judge's suspension or some other punishment, together with such measures as may be deemed proper in order not to create a condition affecting the magistrate, which in the long run may injure the administration of justice rather than himself.

Thus, rather than the *normative* function, which to a certain extent is compulsory under § 24 as it now stands, the Supreme Court should be given, in the initial as well as in the following stages, the more appropriate function of trier

of facts and imposition of punishment in the light of public standards predetermined by law.[10]

In view of the foregoing, in the belief that the charge of immoral conduct which is the charge preferred against the respondent judge calls only for a conviction for immoral conduct, without there being lodged in the Supreme Court the inherent power to discipline him unless he is found guilty of such kind of conduct, in which case only a removal would, in my opinion, be in order; and since in my opinion the facts proved did not show immoral conduct within the meaning and content, as I understand it, of that term under § 24 of our Judiciary Act, I voted for the exoneration of Judge Fernando Gallardo Díaz.

---

[10] It is said that Aragon was the first country in Europe which recognized by 1442 the stability of its judges, and England next in 1688. In the Constitution of Bayonne of 1808, Spain provided for a certain form of immovability, but it was as of the Constitution of Cadiz of 1812, and thereafter in all the constitutions which followed, that provision was made only as respects the judges for the immovability from office, consisting in the prohibition to remove, suspend, transfer, or pension the magistrates except for the causes and other acts provided by law. In the preamble of the Constitution of Cadiz of 1812, it was stated that "Since the integrity of the judges is the most essential requisite for the efficient discharge of their office, it is necessary to insure this virtue by all means possible. Their mind must be free of any impression that might even entertain *remote suspicion* of sudden removal." The Organic Act of the Spanish Judiciary —Act of September 15, 1870—as amended or implemented up to the present time, enumerates expressly and in detail, as does the Penal Code of Spain in the sections dealing with prevarication, the acts which warrant the removal of magistrates, suspension for certain periods, transfers, and other punishments, as well as compensation or loss thereof during the period of suspension. This practice of specifying the acts in detail in the law or in the constitution, at least as respects removal, exists in many other jurisdictions. Medina y Marañón, *Leyes Penales de España* (10th ed. 1947) ; *Códigos, Leyes y Tratados Vigentes* (1885) ; 18 *Enciclopedia Jurídica Española* 903; 20 *Id.* 775; *Id.* App. 1946, p. 916; 6 Alcubilla, *Diccionario de Administración* 173; 41 *Revista de Legislación y Jurisprudencia* 112 *et seq.;* 65 *Id.* 119.